**Chad Stavley, OSB No. 034656**
chad@stavleylaw.com
Law Office of Chad Stavley, P.C.
434 NW 19th Ave
Portland OR 97209
Telephone: (503) 546-8812
Facsimile: (503) 243-1944

**John T. Devlin, OSB No. 042690**
john@johndevlinlaw.com
Devlin Law, P.C.
434 NW 19th Ave
Portland OR 97209
Telephone: (503) 228-3015
Facsimile: (503) 660-4079

Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| CONNIE DENCE, personal representative for the Estate of JANELLE MARIE BUTTERFIELD, Deceased,<br><br>       Plaintiff,<br>  v.<br><br>WELLPATH, LLC, a Delaware corporation; CORRECT CARE SOLUTIONS, LLC, a Kansas corporation; CARLY HINKLE, an individual; DAWN CASE, an individual; OPTIONS FOR SOUTHERN OREGON, INC., an Oregon corporation; MERRICK KELLY-ROBINSON, an individual; JOSEPHINE COUNTY, an Oregon county; DAVE DANIEL, an individual; AMANDA WASS, an individual; CRYSTAL HULSEY, an individual; VIVEK SHAH, an individual; PATRICIA SHEVOKIS, an individual; ED VINCENT, an individual; and CLINT MOONEY, an individual,<br><br>       Defendants. | Civil Action No. 1:20-cv-00671-CL<br><br>**PLAINTIFF'S MOTION TO COMPEL** |

# TABLE OF CONTENTS

MOTION…………………………………………………………………...……5

FACTUAL BACKGROUND…………………………………………………...……5

PROCEDURAL HISTORY…………………………………………………...…8

WELLPATH'S HISTORY OF DISCOVERY PROBLEMS……………………………..9

ARGUMENT…………………………………………………………………......11

    A.  Requests for Production……………………………………………….....…11

    B.  Requests for Admission…………………………………………………38

    C.  Additional Requests for Production……………………………………...56

    D.  Deposition Scheduling……………………………………………...61

    E.  Deposition Questions……………………………………………….…62

CONCLUSION……………………………………………………………..…65

**Cases**

Agster v, Maricopa County, 422 F.3d 836 (9th Cir. 2005) ……………………….…………19

Ali v. Long Creek Youth Development Center, 2019 WL 302488

(D. Me. Jan. 21, 2019) …………………………………………………….........18

Ancata v. Prison Health Services, Inc., 769 F.2d 700 (11th Cir. 1985) ……….………...11

Bolden v. Columbia County, et al (D. Or.)……................................................…63

Estate of Boshears v. Kitsap County, et al (W.D. Wash.)……......................................62

Brogdon v. Correct Care Solutions, et al (W.D. Pa.)……...…………………….……10-11

Estate of Brown v. Conmed Healthcare Management, Inc., et al.

(D. Or.)……………………………………..……………………………...27, 42-43

City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981) …………………….….……18

Early v. State of Arizona, et al (D. Ariz.)……...……………………………………...….…10

Fiacco v. City of Rensselaer, 783 F.2d 319 (2d Cir. 1986) ……………………...….…..17

Green v. Baca, 226 F.R.D. 624 (C.D. Cal. 2005)……………………………………...….…17

Herriges v. County of Macomb, 2020 WL 4726940

(E.D. Mich. Aug. 14, 2020) ……………………...……...…………………..18, 19

Hoptowit v. Ray, 682 F.2d 1237 (9th Cir. 1982)…………………………………….….…11

Louzi v. Fort Bend County, 2021 WL 1751066 (S.D. Tex. May 3, 2021) ...……………..19

Marchand v. Mercy Medical Center, 22 F.3d 933 (9th Cir. 1994) ……………….…...……46

Estate of Moreno v. Correctional Healthcare Companies, et al (E.D. Wash.)……....….9-10

Penman v. Correct Care Solutions, 2020 WL 4253214 (W.D. Ky. July 24, 2020) ……….18

Pennie v. Correct Care Solutions, et al (D. Or.)……………………………………….….…11

Pitkin v. Corizon Health, Inc., 2017 WL 6496565 (D. Or. Dec. 18, 2017) ………....….…17

Soto v. City of Concord, 162 F.R.D. 603 (N.D. Cal. 1995) ……………………………….13

Tanner v. McMurray, 405 F. Supp. 2d 1115 (D.N.M. May 7, 2019) …………..........…18

<u>Whalen v. Columbia County, et al</u> (D. Or.)……................................................…63

## Statutes and Rules

42 U.S.C. §§ 299b-21 to 299b-26 ……………………………………….……18

42 U.S.C. § 1320d …………………………………………………………17, 64

Fed. R. Civ. P. 36…………………………………………………………………40

Fed. R. Civ. P. 37……………………………………………………..………5

OAR 847-035-0030…………………………………………………..………23

OAR 851-006-0000……………………………………………………..…..24, 39

OAR 851-047-0030…………………………………………………..…..23

## MOTION

Pursuant to LR 7-1 and FRCP 37(a)(1), plaintiff certifies that counsel for the plaintiff and counsel for the Wellpath defendants have conferred in good faith about some portions of this motion and that counsel for the Wellpath defendants has willfully refused to confer about other portions of this motion. On June 13, 2022, the Court granted plaintiff's motion to exceed the word count or page limit set forth in LR 26-3(b).

Plaintiff asks this Court for an order requiring the Wellpath defendants to: (1) produce the documents requested in the cited Requests for Production; (2) provide sufficient answers to the cited Requests for Admission; (3) schedule the cited deposition; and (4) allow witnesses to answer the cited deposition questions.

## FACTUAL BACKGROUND

In the early morning hours of July 27, 2018, Janelle Butterfield was arrested on an outstanding warrant for failing to appear on three misdemeanor charges.[1] Ms. Butterfield was taken to the Josephine County Jail, where she was held until she committed suicide on September 5, 2018.[2]

Wellpath, LLC ("Wellpath") is a nationwide, for-profit company that provides the medical care for people being held at the Josephine County Jail.[3] Options for Southern Oregon ("Options") is a local nonprofit that provides the mental health care for people

---

[1] Amended Complaint, ¶ 69 (attached as Exhibit 1 to Declaration of John Devlin in Support of Plaintiff's Motion to Compel ("Devlin Decl.")).
[2] Amended Complaint, ¶ 102 (Ex. 1 to Devlin Decl.).
[3] Wellpath was formed in November 2018 as a result of a merger between Correct Care Solutions and another company. See Amended Complaint, ¶ 5 (Ex. 1 to Devlin Decl.).

being held at the Josephine County Jail.[4] Ms. Butterfield's prior contacts with Josephine County jail staff, Wellpath and Options demonstrated her history of mental illness, substance abuse, and suicidality.[5] For example, Ms. Butterfield was on suicide watch while housed in the Josephine County Jail in February 2016,[6] and numerous Options records noted that Ms. Butterfield had been diagnosed with and treated for psychosis.[7]

When she was booked into the jail, Ms. Butterfield was tased and placed in a restraint chair because of her behavior.[8] A jail deputy flagged her as someone with mental health issues and a Wellpath employee prescribed an antipsychotic medication for her.[9] Ms. Butterfield was placed in segregated housing, where her out-of-cell time and her contact with other people were severely restricted.[10] After four weeks in segregated housing, Ms. Butterfield's mental state had deteriorated to the point that a psychologist determined that she was unable to aid and assist in the defense of her criminal case and needed to be transported to the Oregon State Hospital.[11] Ms. Butterfield committed suicide on the morning of the court appearance that would have resulted in her transport to the Oregon State Hospital.[12]

Janelle Butterfield was in the Josephine County Jail for forty days. She never saw a doctor, a nurse practitioner, or even a nurse during those forty days. She did not have the

---

[4] Amended Complaint, ¶ 12 (Ex. 1 to Devlin Decl.).
[5] Amended Complaint, ¶ 41-68 (Ex. 1 to Devlin Decl.).
[6] See OP BUTT 54, 119, 121 (Ex. 2 to Devlin Decl.).
[7] See, e.g., OP BUTT 80-85 (Ex. 2 to Devlin Decl.).
[8] Amended Complaint, ¶ 71-83 (Ex. 1 to Devlin Decl.).
[9] Amended Complaint, ¶ 71-83 (Ex. 1 to Devlin Decl.).
[10] Amended Complaint, ¶ 84-85 (Ex. 1 to Devlin Decl.).
[11] Amended Complaint, ¶ 95-99 (Ex. 1 to Devlin Decl.).
[12] Amended Complaint, ¶ 100-102 (Ex. 1 to Devlin Decl.).

required medical screening when she was admitted to the jail, and she did not have the required 14-day health assessment during her stay at the jail. On her first day in custody, Carly Hinkle, a nurse practitioner employed by Wellpath, prescribed an antipsychotic medication (Abilify) for Ms. Butterfield based on a phone conversation with a medical staff member and without seeing Ms. Butterfield.[13] That medication was discontinued after two weeks without Ms. Hinkle's knowledge or approval, but Ms. Butterfield's medical chart contains no explanation for this decision.[14] Patricia Shevokis, the registered nurse in charge of the medical program, was on modified duty during this time period and was not allowed to see patients. The only Wellpath medical personnel who saw Ms. Butterfield were people with EMT licenses who were working as "unlicensed assistive personnel" in the jail.[15] Those Wellpath employees completed a daily "Segregation Rounds Log" for Ms. Butterfield,[16] but they had no mental health training and agreed that their rounds were similar to the checks done by the jail deputies.[17]

Janelle Butterfield also did not receive any mental health care while she was in the Josephine County Jail. Merrick Kelly-Robinson, an Options employee, would see people in the jail if someone made a request (known as a "referral"). There is evidence that both a Josephine County jail deputy and one or more Wellpath employees made a referral to prompt someone from Options to see Ms. Butterfield.[18] Options denies that it received any

---

[13] Amended Complaint, ¶ 78-79 (Ex. 1 to Devlin Decl.).
[14] Amended Complaint, ¶ 78-94 (Ex. 1 to Devlin Decl.).
[15] Amended Complaint, ¶ 86-87 (Ex. 1 to Devlin Decl.).
[16] Amended Complaint, ¶ 86 (Ex. 1 to Devlin Decl.).
[17] See Dawn Case Dep. at 109-111 (Ex. 3 to Devlin Decl.); Amanda Wass Dep. at 66-72 (Ex. 4 to Devlin Decl.).
[18] See Dawn Case Dep. at 93-96, 106-107, 193 (Ex. 3 to Devlin Decl.).

referrals.

On August 24, 2018, Ms. Butterfield's criminal defense attorney (Victory Walker) arranged for her to see Dr. Claudia Lake, a psychologist, because of concerns about her deteriorating mental state.[19] Dr. Lake concluded that Ms. Butterfield was not able to aid and assist in the defense of her criminal case and needed treatment at the Oregon State Hospital.[20] On August 27, 2018, Ms. Walker filed a Motion for Determination of Defendant's Fitness to Proceed.[21] The next day, Josephine County Circuit Judge Robert Bain signed an Order for Community Health Consultation.[22]

On August 30, 2018, Merrick Kelly-Robinson saw Ms. Butterfield to perform an aid and assist consultation as a result of Judge Bain's order.[23] Merrick Kelly-Robinson, who was a full-time Options employee with an LPC-Intern license, was not able to complete the consultation because of Ms. Butterfield's mental state.[24] Merrick Kelly-Robinson planned to complete the consultation on September 5, 2018, but was unable to do so because Ms. Butterfield committed suicide that morning.[25]

## PROCEDURAL HISTORY

Counsel for plaintiff has sent numerous letters and emails to counsel for the Wellpath defendants regarding the discovery issues set forth below. The parties conferred by phone on February 2 and by Zoom on May 12. The parties have been unable to resolve

---

[19] Amended Complaint, ¶ 95 (Ex. 1 to Devlin Decl.).
[20] Amended Complaint, ¶ 99 (Ex. 1 to Devlin Decl.).
[21] Amended Complaint, ¶ 96 (Ex. 1 to Devlin Decl.).
[22] Amended Complaint, ¶ 97 (Ex. 1 to Devlin Decl.).
[23] Amended Complaint, ¶ 98 (Ex. 1 to Devlin Decl.).
[24] See Merrick Kelly-Robinson Dep. at 27-36, 146-148, 170-172 (Ex. 5 to Devlin Decl.).
[25] See Merrick Kelly-Robinson Dep. at 149 (Ex. 5 to Devlin Decl.).

their discovery disputes.

On May 18, the Court granted a Joint Motion to Amend Discovery and Pretrial Scheduling Order. The Court set an August 12, 2022 deadline to complete fact discovery.

## WELLPATH'S HISTORY OF DISCOVERY PROBLEMS

The Court should view Wellpath's behavior during discovery in this case as part of a larger pattern of discovery problems across the country.

In Estate of Moreno v. Correctional Healthcare Companies, et al., a judge in the Eastern District of Washington entered a default judgment against two predecessor companies of Wellpath (Correct Care Solutions and Correctional Healthcare Companies) because of the intentional destruction of emails. When deciding on the sanction, the judge offered this summary:

> "Defendants repeatedly failed to provide responsive discovery to Plaintiffs, even after being compelled to do so by this Court, such that the Court found Defendants in contempt of its April 2019 Order. * * * Similarly, Defendants failed to notify Plaintiffs and the Court of the spoliation for approximately eight months while this litigation was ongoing. Rather than telling Plaintiffs or the Court what had occurred, Defendants misled Plaintiffs by promising to provide responsive emails at a later date. Due to the way that Defendants have conducted themselves over the course of this litigation, the Court finds that lesser sanctions are not warranted."[26]

In an earlier ruling in that same case, the judge described additional problems with Wellpath's participation in discovery:

> "Despite having over eight months, Defendants have not complied fully with this Court's prior discovery order by providing complete responses to Plaintiffs. Additionally, Defendants have not requested an extension of deadlines, or otherwise explained why they have waited so long to search for

---

[26] Order Granting Plaintiffs' Rule 37(e) Motion for Default Judgment, Estate of Moreno v. Correctional Healthcare Companies, et al., Case No. 4:18-cv-5171 (E.D. Wash. June 1, 2020) (Ex. 6 to Devlin Decl.).

and produce responsive documents.  While the Court acknowledges that this litigation has been complicated by the retention of new counsel and that Defendants have spent many hours providing responsive documents in this matter, Defendants' failure to comply with this Court's prior order, more than eight months later, is unacceptable."[27]

In <u>Early v. State of Arizona, et al.</u>, a judge in the District of Arizona imposed sanctions on a Wellpath predecessor (Correctional Healthcare Companies) for failure to produce nursing protocols, even after its own witnesses described the protocols during depositions.  The judge explained:

"The Court nonetheless finds that sanctions are in order to compensate Plaintiffs for their reasonable costs and attorneys' fees associated with their many attempts to acquire this evidence and CHC Defendants' repeated denials – until now – that this evidence exists.  * * * CHC Defendants continued to reassert these denials up through their Response to Plaintiffs' Motion * * * despite having unmistakable evidence, dating as far back as September 12, 2017, disproving their position."[28]

In <u>Brogdon v. Correct Care Solutions, et al.</u>, a judge in the Western District of Pennsylvania expressed similar concerns about the discovery practices of a Wellpath predecessor (Correct Care Solutions):

"It appears that Defendants have been waiting until the eleventh hour to identify and deliver documents requested by Plaintiff, which results in disputes and controversies that require further delays.  Such behavior undermines the fair, efficient administration of justice.  The Court already has admonished Defendants that discovery deadlines are not advisory.  It will not do so again."[29]

---

[27] Order Granting Plaintiffs' Third Motion to Compel Discovery and Motion for Sanctions, <u>Estate of Moreno v. Correctional Healthcare Companies, et al.</u>, Case No. 4:18-cv-5171 (E.D. Wash. Jan 8, 2020) (Ex. 7 to Devlin Decl.).

[28] Order, <u>Early v. State of Arizona, et al.</u>, Case No. 2:16-cv-00031 (D. Ariz. May 22, 2018) (Ex. 8 to Devlin Decl.).

[29] Memorandum Opinion Granting Plaintiff's Motion for Sanctions for Discovery Abuses, <u>Brogdon v. Correct Care Solutions, et al.</u>, Case No. 1:16-cv-00012 (W. D. Pa. Dec. 21, 2016) (Ex. 9 to Devlin Decl.).

A few months later, the judge imposed sanctions because some records requested by plaintiff were no longer available:

> "Because Defendants have failed to fulfill their discovery obligations, the bulk of these medical records remain unproduced. Therefore, the Court concludes that the jury is entitled to infer that had the medical records been obtained, they would reflect negatively on the supervision provided by supervising physicians to physician assistants during this time period."[30]

In Oregon, the Honorable Ann Aiken recently referred a series of discovery disputes to the Honorable Thomas Coffin after holding three status conferences in a pending case against Wellpath.[31]

## ARGUMENT

### A. Requests for Production

#### 1. Request for Production No. 2

Plaintiff requested "all contracts and agreements in effect between any defendants in November 2016."[32] Plaintiff has received the relevant documents from Josephine County, but the payment amounts have been redacted at Wellpath's request. Plaintiff believes that the payment amounts should not be redacted because Wellpath's financial motives are central to the issues in this case.[33] For example, Wellpath stated in its contract

---

[30] Order Regarding the Hearing Held on May 5, 2017, Brogdon v. Correct Care Solutions, et al., Case No. 1:16-cv-00012 (W. D. Pa. May 9, 2017) (Ex. 10 to Devlin Decl.).

[31] See Dale Pennie v. Correct Care Solutions, LLC, et al., U.S. District Court for the District of Oregon Case No. 6:21-cv-00252-AA (docket entry number 30).

[32] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also Supplemental Response to Plaintiff's First Request for Production (Ex. 12 to Devlin Decl.). Plaintiff clarified that this request contained a typographical error and should have requested documents "from February 2012 to the present."

[33] See, e.g., Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985) ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."); see also Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982) ("Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems.").

proposal that it "has a culture of cost-effectiveness and a history of successes in cost reductions" and described its use of people with EMT licenses was "a very cost-effective approach" to providing healthcare.

### 2. *Request for Production No. 3*

Plaintiff requested the "personnel files, including performance evaluations and disciplinary records," for each of the named Wellpath defendants (Carly Hinkle, Dawn Case, Amada Wass, Krystal Hulsey, Dr. Vivek Shah, and Patricia Shevokis).[34] The parties have two outstanding issues related to this request.

<u>First</u>, the Wellpath defendants did not provide a personnel file for Krystal Hulsey. The Wellpath defendants promised to provide these documents during the February 2 phone conference, but they did not do so.[35] The Wellpath defendants then stated during the May 12 Zoom conference that Wellpath does not have a personnel file for Krystal Hulsey.[36] In an earlier pleading, Wellpath stated that Ms. Hulsey worked for Wellpath from May 6, 2018 to August 22, 2018.[37] It does not make any sense that Wellpath does not have a personnel file for her. The personnel files produced for other defendants include application materials, offer letters, position descriptions, and other paperwork that Wellpath should have for Ms. Hulsey.

---

[34] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also Supplemental Response to Plaintiff's First Request for Production (Ex. 12 to Devlin Decl.).
[35] See February 2, 2022 emails (Ex. 13 to Devlin Decl.).
[36] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[37] See Response to Interrogatory No. 1 (Ex. 11 to Devlin Decl.).

<u>Second</u>, the Wellpath defendants produced personnel files for the remaining individuals "through September 5, 2018" – the date of Ms. Butterfield's death.[38] Plaintiff believes that information regarding the named defendants is relevant and not privileged, even if the information was gathered after the date of Ms. Butterfield's death.[39] Any information regarding performance issues is potentially relevant, even if the poor performance happened after Ms. Butterfield's death. For example, Patricia Shevokis (the RN who was working as the Health Services Administrator) was terminated one month after Ms. Butterfield's death, but Wellpath has not produced any documents related to her termination. During the May 12 Zoom conference, the Wellpath defendants stated that they would produce complete personnel files, including information after September 5, 2018.[40] Plaintiff has not received the additional discovery.

### 3. Request for Production No. 4

Plaintiff requested "all documents and materials reflecting any policies, procedures, customs, practices, training or guidance applicable to the Josephine County Jail, and to personnel working in the Josephine County Jail" during the time period that Ms. Butterfield was held in the jail.[41] Defendant Josephine County produced an electronic version of its entire policy and procedure manual, both for the Sheriff's Office generally and for the jail

---

[38] See June 4, 2021 letter (Ex. 15 to Devlin Decl.).

[39] See, <u>e.g.</u>, <u>Soto v. City of Concord</u>, 162 F.R.D. 603, 617 (N.D. Cal. 1995) ("In cases with similar factual situations as the case at bar, district courts in the Ninth Circuit have found that the privacy interests police officers have in their personnel files do not outweigh the civil rights plaintiff's need for the documents.").

[40] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

[41] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also Supplemental Response to Plaintiff's First Request for Production (Ex. 12 to Devlin Decl.).

specifically.[42]

The Wellpath defendants offered to "prepare[] a table of contents from the policies and provide this table of contents to plaintiff's counsel" to "select policies from the informal table of contents for production."[43]  In response, plaintiff requested "all of the Wellpath/CCS policies and procedures applicable to the Josephine County Jail from July-September 2018."[44]

Plaintiff believes that producing complete versions of all policies and procedures (as Josephine County did) is not unduly burdensome because this case involves numerous issues with Wellpath's medical program and therefore involves many different policies and procedures.  Those issues include intake screening, mental health screening, initial health assessments, medication administration, chronic care screening, segregation rounds, and the coordination of care among Wellpath, Options for Southern Oregon, and Josephine County.  The policies and procedures can be produced electronically, which reduces the burden on Wellpath.

The Wellpath defendants agreed to produce a complete set of policies and procedures during the May 12 Zoom conference.[45]  Plaintiff has not received the additional discovery.

---

[42] This production totaled just over 1,000 pages.  The documents were produced electronically.
[43] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.); December 16, 2021 letter (Ex. 17 to Devlin Decl.).
[44] See May 15, 2021 letter (Ex. 16 to Devlin Decl.).
[45] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

### 4. *Request for Production No. 11*

Plaintiff requested "a corporate organizational chart for Wellpath, LLC from the July-October 2018 time frame, including the corporate organization in Oregon." When the Wellpath defendants responded that "[i]t is not known what is meant by 'corporate organizational chart,'"[46] plaintiff explained that she was seeking "a diagrammatic representation showing how departments or divisions in an organization, such as a large corporation, are related to one another along lines of authority."[47] During the February 2 phone conference, plaintiff agreed to limit this request to "any organizational charts that reference Wellpath/CCS staff at the Josephine County Jail, such as the site HSA, site Medical Director or other personnel."[48] The Wellpath defendants agreed to look into this request. The Wellpath defendants repeated this promise during the May 12 Zoom conference.[49] Plaintiff has not received the requested organizational chart from the Wellpath defendants.

### 5. *Request for Production No. 13*

Plaintiff requested "the monthly billing sent by Wellpath, LLC to Josephine County for medical and mental health services in the Josephine County Jail for all of 2018." The Wellpath defendants objected to this request on the basis of relevance.[50]

---

[46] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.).
[47] See December 16, 2021 letter (Ex. 17 to Devlin Decl.).
[48] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[49] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[50] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.).

As noted above, plaintiff believes that Wellpath's financial motives are central to the issues in this case.[51] Plaintiff contends that the Josephine County Jail medical and mental health programs were understaffed because of financial considerations. For example, Wellpath stated in its contract proposal that it "has a culture of cost-effectiveness and a history of successes in cost reductions" and described its use of people with EMT licenses was "a very cost-effective approach" to providing healthcare.

6. *Request for Production No. 15*

Plaintiff requested "copies of any lawsuits filed against Wellpath, LLC, or its predecessors, in the last ten years in which the plaintiff claimed inadequate or inappropriate medical care was provided in a jail or prison facility in which Wellpath LLC, or its predecessors, were providing medical care." The Wellpath defendants have objected to this request on the grounds of overbreadth, undue burden, and relevance.[52] During the February 2 phone conference, plaintiff agreed to limit this request to "all lawsuits related to mental health, mental illness, or lack of medication."[53] The Wellpath defendants maintained the objections to this request.

Plaintiff believes that this information is relevant because one of the ways that a plaintiff can establish a <u>Monell</u> claim is to demonstrate a pattern and practice of similar conduct by Wellpath. In Oregon alone, Wellpath or its predecessors have been sued for

---

[51] See discussion of Request for Production No. 1.
[52] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.).
[53] See February 2, 2022 email (Ex. 13 to Devlin Decl.).

wrongful death in federal court by the Estate of Benjamin Fager, the Estate of Donnie Brown, the Estate of Rocky Stewart, and the Estate of Kathleen Norman over the last eight years.[54] Prior lawsuits also provide notice to Wellpath that support negligence and punitive damages claims.[55]

The Wellpath defendants also objected because "HIPAA mandates that Wellpath maintains the privacy of its patients, which include their names. * * * HIPAA information subject to use in litigation, which necessarily includes a name, is not to be used or disclosed after the conclusion of the case."[56] Plaintiff responded that the cited portions of HIPAA do not support this objection, because plaintiff is not seeking any "health information" about the plaintiffs in the other lawsuits.[57] Plaintiff is asking the Wellpath defendants to produce public records, not health records.

### 7.    Request for Production No. 19

Plaintiff requested "a current balance sheet or other reliable document showing the net worth of Wellpath, LLC." The Wellpath defendants objected to this request on

---

[54] In recent months, Wellpath has been sued for wrongful death in Oregon federal court by the Estate of Christina Ryan and the Estate of Carl Sullivant.

[55] See Pitkin v. Corizon Health, Inc., 2017 WL 6496565, at *6 (D. Or. Dec. 18, 2017) ("I find that the complaints, settlements, and judgments of all lawsuits filed against Corizon concerning inmate deaths resulting from withdrawal of opiates or other drugs within the last ten years are relevant to establishing a policy or custom of depriving inmates of their constitutional rights and must be produced."); see also Green v. Baca, 226 F.R.D. 624, 641-42 (C.D. Cal. 2005) ("The court agrees that showing defendant was aware of the number of alleged over-detentions is essential to establish liability under Monell, and that evidence of the number of settlements into which he entered may be admissible to prove knowledge."); Fiacco v. City of Rensselaer, 783 F.2d 319, 327-28 (2nd Cir. 1986) ("We have no doubt that, in the context of a theory that the City negligently supervised its officers in their use of force, the evidence that a number of claims of police brutality had been made by other persons against the City, together with evidence as to the City's treatment of those claims, was relevant.").

[56] See June 4, 2021 letter (Ex. 15 to Devlin Decl.).

[57] See December 16, 2021 letter (Ex. 16 to Devlin Decl.); see also 42 U.S.C. § 1320d(4)(A) ("The term 'health information' means any information, whether oral or recorded in any form or medium, that * * * is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse * * * .").

relevance grounds because "Wellpath is a privately held company."[58]

Plaintiff believes that the requested information is relevant because plaintiff has made a claim for punitive damages in this case. Financial information about a defendant is relevant to a punitive damages claim.[59]

### 8. Request for Production No. 20

Plaintiff requested "all documents and materials relating to any mortality review, morbidity report, root cause analysis, sentinel event or any similar type of internal audit or review of the death of Janelle Butterfield." The Wellpath defendants objected on the basis of the Patient Safety and Quality Improvement Act ("PSQIA"), 42 U.S.C. §§ 299b-21 to 299b-26. The Wellpath defendants also referenced an interrogatory response stating that "Dawn Ducote submitted a mortality review to The Center for Patient Safety on January 23, 2020 on behalf of CCS."[60]

Wellpath bears the burden of establishing that it has met the requirements to qualify for PSQIA protection. Several federal courts have found that Wellpath/CCS did not meet those requirements in other cases.[61] In the most recent case, a federal judge in Texas

---

[58] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.).

[59] See, e.g., City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 270 (1981) (noting that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages").

[60] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.).

[61] See Herriges v. County of Macomb, 2020 WL 4726940, at *8 (E.D. Mich. Aug. 14, 2020) ("CCS has failed to sustain its burden of showing that the Reports of the Macomb County inmates who committed suicide from September 2012 to October 2019 are privileged under the PSQIA."); Penman v. Correct Care Solutions, 2020 WL 4253214, at *5 (W.D. Ky. July 24, 2020) ("CCS failed to meet its burden of establishing that the Report is PSWP"); Tanner v. McMurray, 405 F. Supp. 2d 1115, 1224-25 (D.N.M. May 7, 2019) ("Correct Care has not met its burden of demonstrating that it is entitled to its claimed PSQIA privilege and cannot therefore claim it."); Ali v. Long Creek Youth Development Center, 2019 WL 302488, at *7 (D. Me. Jan. 21, 2019) (CCS "fails to demonstrate that the documents at issue qualify for the narrow privilege created by the PSQIA").

expressed "lingering concerns about CCS's handling of patient information both in this case and more broadly" as well as "about CCS's commitment to careful handling of patient information and perhaps about the candor of its representations to the Court."[62]

On May 13, the Wellpath defendants produced four heavily redacted pages from a Morbidity & Mortality Report and Review. These documents are not sufficient to satisfy Wellpath's burden of proving entitlement to PSQIA protection. For example, based on all of the information produced to date by Wellpath, the mortality review was submitted to the Center for Patient Safety more than sixteen months after Ms. Butterfield's death. Wellpath has not explained the reason for this delay, which undercuts its entitlement to PSQIA protection.

Wellpath also bears the burden of proving entitlement to any other privileges that it might cite to shield the mortality review. For example, Oregon's peer review privilege is not applicable to this federal case.[63]

>        9.      *Request for Production No. 24*

Plaintiff requested "all call lists and provider schedules in effect with regard to the Josephine County Jail for the entirety of 2018, showing the schedules of off-site on-call providers and names and contact information for the same." The Wellpath defendants stated that they would provide "the on-call schedule for Dr. Shah from July 27, 2018

---

[62] Louzi v. Fort Bend County, 2021 WL 1751066, at *2 (S.D. Tex. May 3, 2021); see also Herriges v. County of Macomb, 2020 WL 4726940, at *4 (E.D. Mich. Aug. 14, 2020) (noting that the affidavit and testimony of the Wellpath/CCS witness "raised several red flags about his and CCS's credibility").
[63] See Agster v. Maricopa County, 422 F.3d 836, 839-40 (9th Cir. 2005).

through September, 2018."[64]  The Wellpath defendants reiterated on February 2 and on May 12 that they would produce that document.[65]  Plaintiff has not received this document to date.

### 10.  Request for Production No. 27

Plaintiff requested "all quality improvement program documents for the Josephine County Jail from the time Wellpath, LLC or its predecessor companies first began providing services at the Josephine County Jail to the present time."  The Wellpath defendants objected to this request on a variety of grounds, including HIPAA and PSQIA privilege.[66]  Plaintiff has discussed those objections in connection with other requests.[67]

The Wellpath defendants also objected on relevance grounds.  When it obtained the contract, Wellpath/CCS submitted a detailed response to the Request for Proposals issued by Josephine County.  The original Contract for Professional Services between Josephine County and Wellpath/CCS (then known as Conmed) explicitly incorporated the RFP response.  Plaintiff contends that Wellpath/CCS failed to comply with various promises made in that RFP response, such as having a quality improvement program.

The Wellpath defendants indicated during the February 2 conference that they would review this request further.[68]  The Wellpath defendants repeated this promise during

---

[64] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.).
[65] See February 2, 2022 email (Ex. 13 to Devlin Decl.); see also May 12, 2022 email (Ex. 14 to Devlin Decl.).
[66] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.); see also June 4, 2021 letter (Ex. 15 to Devlin Decl.).
[67] See discussion of Request for Production Nos. 15 (HIPAA), 20 (PSQIA).
[68] See February 2, 2022 email (Ex. 13 to Devlin Decl.).

the May 12 Zoom conference.[69]  Plaintiff has not received any update on whether Wellpath intends to produce documents responsive to this request.

### 11. *Request for Production No. 31*

Plaintiff requested documents "regarding the meeting at the Josephine County Jail that Dr. Vivek Shah described at page[] 42 of his deposition."  The Wellpath defendants objected to this request on relevance grounds.[70]

Plaintiff believes that this information is relevant because Dr. Shah, the regional medical director, was the only doctor involved in the Josephine County Jail medical program.[71]  Dr. Shah lived in Washington State and was not providing regular supervision of the Josephine County Jail medical program.[72]  In his deposition, Dr. Shah recalled that "[o]nce there was a – there was a meeting of some sort with custody where the HSA at the time wanted me to stay present."[73]  Given that Dr. Shah visited the jail "less than ten times,"[74] plaintiff would like to obtain any available information about the only meeting that he could remember taking place at the Josephine County Jail.

On February 2, the Wellpath defendants agreed to follow up on this request.[75]  The Wellpath defendants repeated this promise during the May 12 Zoom conference.[76]  Plaintiff has not received any additional information.

---

[69] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[70] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[71] Shah Dep. at 41-43 (Ex. 19 to Devlin Decl.).
[72] Shah Dep. at 49-50 (Ex. 19 to Devlin Decl.).
[73] Shah Dep. at 42 (Ex. 19 to Devlin Decl.).
[74] Shah Dep. at 41-42 (Ex. 19 to Devlin Decl.).
[75] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[76] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

### 12.    *Request for Production No. 32*

Plaintiff requested documents "regarding any face-to-face meetings between Dr. Vivek Shah and Carly Hinkle from 2015 to the present." The Wellpath defendants objected on relevance grounds because "the request seeks documents outside of the period of [Janelle] Butterfield's relevant incarceration."[77]

Plaintiff believes that this information is relevant because Dr. Shah (the regional medical director) was not providing regular supervision of Ms. Hinkle (the NP coming weekly to the Josephine County Jail).[78] Dr. Shah testified that he met Ms. Hinkle face-to-face "less than five times."[79] Ms. Hinkle agreed with that estimate.[80] Given that lack of supervision, plaintiff would like to obtain any available information about the small number of times that they did meet face-to-face.

The Wellpath defendants also objected to producing any information after Ms. Butterfield's death and any information covered by HIPAA. Plaintiff has addressed those objections above.[81]

On May 12, the Wellpath defendants agreed to follow up on this request.[82] Plaintiff has not received any additional information.

---

[77] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[78] Shah Dep. at 45-46 (Ex. 19 to Devlin Decl.); Hinkle Dep. at 51 (Ex. 20 to Devlin Decl.).
[79] Shah Dep. at 53 (Ex. 19 to Devlin Decl.).
[80] Hinkle Dep. at 38 (Ex. 20 to Devlin Decl.).
[81] See discussions of Request for Production Nos. 3 (post-mortem), 15 (HIPAA).
[82] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

*13.    Request for Production No. 33*

Plaintiff requested "all documents submitted to the Oregon Health Authority in connection with the licensing of EMS providers working in the Josephine County Jail." The Wellpath defendants objected on relevance grounds.[83]

Plaintiff believes that this information is relevant because the only Wellpath personnel who saw Janelle Butterfield during her forty days in custody were three people with EMT licenses (Amanda Wass, Krystal Hulsey and Dawn Case) who used the title "EMT" when doing their work for Wellpath. Plaintiff intends to prove that Wellpath was violating Oregon law by hiring people to work as EMTs in the Josephine County Jail.

First, plaintiff intends to prove that Wellpath and the EMTs employed by Wellpath were not following Oregon's rules governing EMT practice. For example, Oregon law states that an EMT "may not function without assigned standing orders issued by a Board-approved supervising physician."[84] Dr. Shah testified that he did not know that people with EMT licenses were working in the jail and that he was not their supervising physician.[85] The Wellpath defendants have admitted that "no standing orders were assigned" to the EMTs.[86]

Second, plaintiff intends to prove that Wellpath (then known as Conmed) was warned about its use of EMTs in jails numerous times before July 27, 2018 (the date Janelle

---

[83] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[84] OAR 847-035-0030(5).
[85] See Shah Dep. at 64-66 (Ex. 19 to Devlin Decl.).
[86] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).

Butterfield was booked into the Josephine County Jail).[87]  Plaintiff intends to prove that people with EMT licenses are not allowed to use the title "EMT" or to work under their EMT licenses while providing non-emergency care in a jail.  Each of those Wellpath employees was an "unregulated assistive person," which is defined under Oregon law as "a person whose position description or job within an organization or client healthcare team does not require licensure or certification by a state of Oregon health related licensing agency."[88]

Plaintiff believes that documentation submitted to the Oregon Health Authority, by the individual EMTs or by Wellpath as the EMS provider, is relevant to the issue of whether those individuals could work as EMTs in the Josephine County Jail.  Plaintiff would like to see what the individuals and/or Wellpath said about the work that they would be doing in the jail.  Alternatively, if Wellpath or those individuals never submitted documentation to the Oregon Health Authority, that fact also is relevant to this issue.[89]

The Wellpath defendants also objected "to the extent that documents are available from a third party, government entity."  Plaintiff has attempted to get documents from the Oregon Health Authority on this issue.  The Oregon Health Authority has no information indicating that Wellpath was registered as an EMS agency, which means that the OHA also has no information about who, if anyone, was the required supervising physician.  Plaintiff

---

[87] See Amended Complaint, ¶¶ 31-40 (Ex. 1 to Devlin Decl.).
[88] OAR 851-006-000(142).
[89] According to the Oregon Health Authority website, a non-transport EMS agency can register with the OHA-EMS, which maintains an active database of registered agencies.  See https://www.oregon.gov/oha/PH/PROVIDERPARTNERRESOURCES/EMSTRAUMASYSTEMS/AMBULANCE SERVICELICENSING/Pages/index.aspx (checked on June 14, 2022).

is attempting with this request for production to see if the Wellpath defendants have any documentation or, alternatively, to confirm that no such documentation was ever submitted.

On May 12, the Wellpath defendants agreed to follow up on this request.[90] Plaintiff has not received any additional information.

### 14. *Request for Production Nos. 35-38*

Plaintiff requested documents related to any work-related injuries, leaves of absence or modified duty for Patricia Shevokis, who was the Health Services Administrator ("HSA") from July to September 2018. Plaintiff also requested any documents related to any time that another Wellpath employee filled in for Ms. Shevokis as the HSA. The Wellpath defendants objected on relevance grounds.[91]

The HSA position is a critical role in the structure of the Josephine County Jail medical program. Ms. Shevokis was scheduled to be at the jail eight hours per day, Monday through Friday. As a registered nurse, she was able to perform tasks that the people with EMT licenses were not able to perform. Numerous people testified that Ms. Shevokis ran the day-to-day operations of the jail medical program.[92]

There is no dispute that Ms. Shevokis did not see Janelle Butterfield during her forty-day period of incarceration before her suicide. The Wellpath defendants initially stated in an interrogatory answer: "[Ms.] Shevokis did not have personal contact with

---

[90] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[91] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[92] See, e.g., Hinkle Dep. at 59 (Ex. 20 to Devlin Decl.); Shevokis Dep. at 26-27 (Ex. 22 to Devlin Decl.).

Butterfield because of a work release related to an on-the-job injury, but she reviewed chart notes."[93] The Wellpath defendants later acknowledged that Ms. Shevokis did not review Ms. Butterfield's chart while she was alive,[94] adding that: "Ms. Shevokis does not believe there was a reason to review her chart and is not aware of any request for her to review Ms. Butterfield's chart."[95]

During her deposition, Ms. Shevokis testified that she was not "providing any direct patient care" from July to September 2018 because she "had an injury to my right shoulder."[96] She explained that she "couldn't go out into the – into the jail to see an inmate, I couldn't respond to a code. I was not to have any patient contact."[97] Ms. Shevokis did not know if anyone was covering the responsibilities that she could not do during this time period.

Nothing in the personnel file documents produced by Wellpath sheds any light on this issue. There are no references to any periods of modified duty or to any workplace injuries. The time records produced by Wellpath do not show any leave of absence or modified duty for Ms. Shevokis.

Plaintiff is attempting to gather all available information on this issue, because Ms. Shevokis' inability to perform her HSA duties during Ms. Butterfield's incarceration is crucial evidence of the deliberate indifference of numerous individuals. In an opinion

---

[93] See Response to Plaintiff's First Discovery Requests (Ex. 11 to Devlin Decl.).
[94] Shevokis Dep. at 137, 140 (Ex. 22 to Devlin Decl.).
[95] See Response to Plaintiff's Third Set of Interrogatories (Ex. 23 to Devlin Decl.).
[96] Shevokis Dep. at 131-132 (Ex. 22 to Devlin Decl.).
[97] Shevokis Dep. at 141 (Ex. 22 to Devlin Decl.).

issued in November 2017, the Honorable Thomas Coffin found that a Wellpath (then known as Conmed) HSA's "decision to travel to an out-of-state conference without procuring a replacement RN at the jail, thus delegating the health care needs of Brown and other inmates to staff EMTs * * * , who were not qualified to diagnose or treat him" could be a basis from which "a jury could reasonably infer that [the HSA] was deliberately indifferent to Brown's serious medical needs." [98]   Oregon law clearly defines the rules under which a nurse can delegate nursing authority to an unlicensed person.[99]   A nurse cannot comply with those rules if she is absent from the building or not seeing patients.

During our February 2 meeting, counsel for the Wellpath defendants said that this information has been requested.[100]   On May 13, the Wellpath defendants produced some additional information from Ms. Shevokis' personnel file, but those documents did not shed any further light on this issue.   It does not make sense that there is no record of Ms. Shevokis' leave of absence and/or modified duty in Wellpath's files, either in the personnel file or in emails about those topics.

### 15.   Request for Production No. 39

Plaintiff requested all documents related to a meeting of Wellpath personnel described by Ms. Shevokis in her deposition.   The Wellpath defendants objected on vagueness and relevance grounds.[101]

---

[98] See, e.g., Findings & Recommendation, Estate of Donnie Ray Brown v. Conmed Healthcare Management, et al., Case No. 6:14-cv-01620 (D. Or. Nov. 28, 2017), at 10-11 (Ex. 24 to Devlin Decl.).  The Honorable Michael McShane adopted these Findings & Recommendations in full.  See Order, Estate of Donnie Ray Brown v. Conmed Healthcare Management, et al., Case No. 6:14-cv-01620 (D. Or. Jan. 31, 2018) (Ex. 25 to Devlin Decl.).
[99] See OAR 851-047-0030.
[100] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[101] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).

Asked whether she ever attended any regional meetings for Wellpath, Ms. Shevokis testified that she recalled a meeting "in Portland, Oregon" that "might have been in 2018."[102] She was the only person in attendance from the Josephine County Jail, and she recalled that "maybe" 25-35 people total attended the meeting.[103] She testified that people attended from "Jackson County, Coos Bay, Roseburg" and "probably" from "every jail" in Oregon where Wellpath provided the medical care.[104]

Plaintiff does not believe this request is vague. Ms. Shevokis described a specific regional meeting held in Portland. Wellpath either has records from that meeting or it does not have records from that meeting. Plaintiff believes this information is relevant because some of the discussions during this meeting likely touched on one of the many policy and procedure issues raised by this case.

During our February 2 meeting, counsel for the Wellpath defendants said that this information has been requested.[105] On May 12, the Wellpath defendants agreed to follow up on this request.[106] Plaintiff has not received any additional information.

### 16. *Request for Production No. 40*

Plaintiff requested all documents related to an incident described by Patricia Shevokis in her deposition. Ms. Shevokis testified that Wellpath fired her in October 2018 because she "was accused of physically touching somebody.  * * * It was a medical staff

---

[102] Shevokis Dep. at 61 (Ex. 22 to Devlin Decl.).
[103] Shevokis Dep. at 61-62 (Ex. 22 to Devlin Decl.).
[104] Shevokis Dep. at 63 (Ex. 22 to Devlin Decl.).
[105] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[106] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

member."[107]  Ms. Shevokis said that she "put my hand on the small of her back" so that a corrections deputy could pass them in a hallway.[108]  Ms. Shevokis explained that she spoke with "Aaron" from "the Human Resource department" and "was totally, totally taken back, floored, disappointed, because it just was what it was.  It was just a gesture.  Nothing more."[109]  The Wellpath defendants objected to this discovery request on relevance grounds.[110]

Plaintiff believes that the requested information is relevant because Ms. Shevokis was fired just a few weeks after Ms. Butterfield's death.  Both Ms. Shevokis and Lieutenant Ed Vincent, the Josephine County jail commander, have testified that they do not believe that she should have been fired based on this interaction with a co-worker.[111]  Given this questionable explanation for her termination, as well as her overall poor management of the jail medical program, this raises the question of whether the stated reason for her termination was pretextual, in order to obscure the actual reason for her termination. Ultimately, Ms. Shevokis is one of the people responsible for the fact that Ms. Butterfield did not see a doctor, nurse or nurse practitioner during her forty days in the jail.

During our February 2 meeting, counsel for the Wellpath defendants said that this information had been requested.[112]  On May 12, the Wellpath defendants agreed to follow up on this request.[113]  Plaintiff has not received any additional information.

---

[107] Shevokis Dep. at 116-117 (Ex. 22 to Devlin Decl.).
[108] Shevokis Dep. at 118-119 (Ex. 22 to Devlin Decl.).
[109] Shevokis Dep. at 120 (Ex. 22 to Devlin Decl.).
[110] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[111] Shevokis Dep. at 116-123 (Ex. 22 to Devlin Decl.); Vincent Dep. at 117-119 (Ex. 26 to Devlin Decl.).
[112] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[113] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

17.     *Request for Production Nos. 42 and 47*

Plaintiff requested all documents related to the medication refusal policy described by Patricia Shevokis during her deposition.  Plaintiff also requested all documents related to "whether a particular number of medication refusals would trigger some additional follow up, such as speaking with a provider."[114]  Ms. Shevokis testified that "[i]f a patient refused medication, if it was after three times, or I remember correctly four in a seven-day timeframe, they were referred, yes.  It was referred to the medical doctor."[115]  The Wellpath defendants objected that "Ms. Shevokis was not asked if there was a written policy in place, nor did she make a statement that there was a written policy." [116]

Plaintiff believes that the requested information is relevant because the Wellpath staff documented refusals of her antipsychotic medication by Ms. Butterfield on August 5, August 6, August 7, August 8 and August 10, but there is no indication that anyone spoke with a doctor or nurse practitioner about those refusals.  In addition, the Wellpath medical records indicate that the Wellpath medical staff stopped offering antipsychotic medication to Ms. Butterfield after August 12, but there is no indication that anyone spoke with a doctor or nurse practitioner about that decision.   Carly Hinkle testified during her deposition that she did not know about the refusals, even though "I had always told the staff if somebody had refused three times in a row, or three days in a row, that I wanted to be notified."[117]   Ms. Hinkle also testified that she did not know that Ms. Butterfield's

---

[114] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[115] Shevokis Dep. at 125 (Ex 22 to Devlin Decl.).
[116] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[117] See Hinkle Dep. at 133-136 (Ex. 20 to Devlin Decl.).

medication had been stopped.[118]

On February 2, the Wellpath defendants agreed to follow up on this request.[119] On May 12, the Wellpath defendants agreed to follow up on this request.[120] Plaintiff has not received any additional information.

### 18.    *Request for Production Nos. 44 and 48*

Plaintiff requested all documents related to the discussions of the scope of practice for Dawn Case and Krystal Hulsey. Ms. Case and Ms. Hulsey are two of the people with EMT licenses who interacted with Ms. Butterfield during her forty-day stay in the jail. Both of them testified that they had discussions with Patricia Shevokis about whether they were working under their EMT licenses or as certified medical assistants (CMAs) in the jail.[121] In addition, Ms. Case signed a document on August 2, 2018 – while Ms. Butterfield was in custody – stating that she was to "perform in the scope of an EMT" and not a CMA.[122] The Wellpath defendants objected to these requests on relevance grounds.[123]

Plaintiff believes that this information is relevant because, as discussed above, the issue of Wellpath's use of EMTs is central to this case.[124] Based on the evidence received to date, it appears that two of the people with EMT licenses were discussing this exact issue with Ms. Shevokis and others at Wellpath while Ms. Butterfield was in custody. Ms. Case testified that she and Ms. Shevokis sent an email to a regional manager named Rachel

---

[118] See Hinkle Dep. at 137 (Ex. 20 to Devlin Decl.).
[119] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[120] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[121] Case Dep. at 35-40 (Ex. 3 to Devlin Decl.); Hulsey Dep. at 64-69 (Ex. 27 to Devlin Decl.).
[122] See Ex. 28 to Devlin Decl.
[123] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[124] See discussion of Request for Production No. 33.

Hemphill.[125]   Ms. Hulsey testified that she spoke with "Aaron" from the Wellpath HR department and maybe with Carly Hinkle (the Wellpath NP).[126]

During our February 2 meeting, counsel for the Wellpath defendants said that this information had been requested.[127]   On May 12, the Wellpath defendants agreed to follow up on this request.[128]   Plaintiff has not received any additional information.

### 19.    *Request for Production No. 45*

Plaintiff requested all documents related to "any concerns or complaints about Patricia Shevokis made by Krystal Hulsey," as described by Dawn Case and Krystal Hulsey in their depositions.[129]   Ms. Hulsey testified that she reported Ms. Shevokis to "HR" on several occasions "for things that I felt uncomfortable about, and she knew about them." Asked for specifics, Ms. Hulsey said "things like changing medical orders, things like forging signatures, changing medications, changing doctors' orders, and for – also for using inappropriate language – racist comments, sexist comments, towards both inmates and co-workers."[130]   Ms. Case testified that Ms. Shevokis "did say some things to Crystal [sic] that had to be reported to human resources, and as far as I know it was reported.  * * * They were racial in nature and my sister [Hulsey] is Mexican."[131]   The Wellpath defendants objected on relevance grounds.[132]

---

[125] Case Dep. at 38-39 (Ex. 3 to Devlin Decl.).
[126] Hulsey Dep. at 65-67 (Ex. 27 to Devlin Decl.).
[127] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[128] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[129] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[130] Hulsey Dep. at 67-68 (Ex. 27 to Devlin Decl.).
[131] Case Dep. at 47-49 (Ex. 3 to Devlin Decl.).  Ms. Case then quoted two derogatory terms that she heard Ms. Shevokis use.
[132] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).

Plaintiff believes that the requested information is relevant because the alleged conduct relates to Ms. Shevokis' overall poor management of the jail medical program. Ms. Shevokis is one of the named defendants in this case, and a jury will have to determine if she was deliberately indifferent to Ms. Butterfield's serious medical needs. Evidence about her attitude toward people in custody and about her attitude toward basic safety and integrity issues are relevant to that decision. Plaintiff also notes that the Wellpath defendants have produced Ms. Shevokis' personnel file, but that file did not contain any documentation of these complaints.

During our February 2 meeting, counsel for the Wellpath defendants said that this information had been requested.[133] On May 12, the Wellpath defendants agreed to follow up on this request.[134] Plaintiff has not received any additional information.

### 20. Request for Production No. 46

Plaintiff requested "all documents related to any training provided by Wellpath/CCS regarding how to conduct segregation rounds," including "how to complete the Segregation Rounds Log." The Wellpath defendants objected by stating: "See deposition testimony of Wellpath staff regarding conducting segregation rounds."[135]

Plaintiff believes that the requested information is relevant because the people with EMT licenses completed a daily Segregation Rounds Log for Ms. Butterfield during her time in custody. Ms. Case and Ms. Wass testified that they got on-the-job training from

---

[133] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[134] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[135] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).

other people with EMT licenses, but they did not get any training from a medical provider, a nurse, or a mental health professional.[136]  Plaintiff intends to prove that the people with EMT licenses who saw Ms. Butterfield were not qualified or trained to conduct this daily check, which is a critical safeguard for people being held in segregated housing.  Plaintiff wants to see what, if any, training materials exist for performing these daily checks.

During our February 2 meeting, counsel for the Wellpath defendants said that this information had been requested.[137]  On May 12, the Wellpath defendants agreed to follow up on this request.[138]  Plaintiff has not received any additional information.

### 21.    Request for Production No. 49

Plaintiff requested "all emails between Dr. Vivek Shah and Carly Hinkle."  The Wellpath defendants objected as unduly burdensome, citing the difficulties of searching for responsive emails.[139]  Plaintiff proposed that the Wellpath defendants conduct the initial search to determine the number of responsive emails.[140]

Plaintiff believes that the requested information is relevant because both Dr. Shah and Ms. Hinkle testified that he provided little to no supervision of her work at the Josephine County Jail.[141]  As a result, the number of emails between them might be very small.  Given that lack of supervision, plaintiff would like to obtain any available information about the times that they did email each other.

---

[136] Case Dep. at 112-114 (Ex. 3 to Devlin Decl.); Wass Dep. at 68-69 (Ex. 4 to Devlin Decl.).
[137] See February 2, 2022 email (Ex. 13 to Devlin Decl.).
[138] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[139] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[140] See January 5, 2022 letter (Ex. 29 to Devlin Decl.).
[141] Shah Dep. at 45 (Ex. 19 to Devlin Decl.); Hinkle Dep. at 51 (Ex. 20 to Devlin Decl.).

The Wellpath defendants also objected to producing any information after Ms. Butterfield's death and any information covered by HIPAA. Plaintiff has addressed those objections above.[142]

On May 12, the Wellpath defendants agreed to follow up on this request.[143] Plaintiff has not received any additional information.

### 22. *Request for Production No. 50*

Plaintiff requested a copy of "all nursing protocols that Carly Hinkle reviewed and approved," as described in her deposition. Ms. Hinkle agreed that she "was the person who was guiding the clinical services at the Josephine County Jail" and was "the person that reviewed and approved nursing protocols."[144] She specifically recalled reviewing and approving the protocols for alcohol withdrawal and opiate withdrawal.[145] The Wellpath defendants objected on relevance grounds.[146]

The arguments regarding this request mirror the arguments related to Request for Production No. 4, which involves policies and procedures. In addition, plaintiff is attempting to identify any nursing protocols that Ms. Hinkle did not review and approve, because she has acknowledged that she is the person who is supposed to review and approve them.

---

[142] See discussion of Request for Production No. 15.
[143] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[144] Hinkle Dep. at 55-56 (Ex. 20 to Devlin Decl.).
[145] Hinkle Dep. at 56 (Ex. 20 to Devlin Decl.).
[146] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).

The Wellpath defendants also objected to producing any information after Ms. Butterfield's death and any information covered by HIPAA. Plaintiff has addressed those objections above.[147]

On May 12, the Wellpath defendants agreed to follow up on this request.[148] Plaintiff has not received any additional information.

### 23.    Request for Production No. 51

Plaintiff requested "all emails between Carly Hinkle and any psychiatric nurse practitioners working for Options," as described by Ms. Hinkle in her deposition. Ms. Hinkle testified that she emailed with both of the psychiatric nurse practitioners that Options hired after Ms. Butterfield's death.[149] The Wellpath defendants objected to this request as unduly burdensome, citing the difficulties of searching for responsive emails.[150] Plaintiff proposed that the Wellpath defendants conduct the initial search to determine the number of responsive emails.[151]

Plaintiff believes that the requested information is relevant because it will shed light on the relationship between Wellpath and Options in connection with providing health care to the people being held in the Josephine County Jail. Prior to Ms. Butterfield's death, Merrick Kelly-Robinson (an Options employee) would meet with a person in custody to discuss mental health issues, but Ms. Hinkle (a Wellpath employee) would prescribe any

---

[147] See discussion of Request for Production No. 15.
[148] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[149] Hinkle Dep. at 83-84 (Ex. 20 to Devlin Decl.).
[150] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[151] See January 5, 2022 letter (Ex. 29 to Devlin Decl.).

necessary mental health medications. Merrick Kelly-Robinson testified that their contact with Ms. Hinkle "was very infrequent," and Ms. Hinkle agreed with that statement.[152]

After Ms. Butterfield's death, Options hired a psychiatric nurse practitioner to see people via telemedicine in the jail, although Ms. Hinkle still prescribed any necessary medications.[153] The requested emails will provide information on about the types of issues that led Ms. Hinkle and the PNPs to contact each other, because they are likely to mirror the issues raised by Ms. Butterfield's situation (such as psychosis, inability to aid and assist, and medication refusals).

The Wellpath defendants also objected to producing any information after Ms. Butterfield's death and any information covered by HIPAA. Plaintiff has addressed those objections above.[154]

On May 12, the Wellpath defendants agreed to follow up on this request.[155] Plaintiff has not received any additional information.

### 24. *Request for Production No. 61*

Plaintiff requested "all documents related to the meeting with Clint Mooney, Carly Hinkle, and someone from the jail staff," as described by Clint Mooney (an Options supervisor) during his deposition. Mr. Mooney testified that he recalled a single meeting attended by Carly Hinkle, the Wellpath HSA, someone from the sheriff's office and him "to have some conversation about, yeah, everybody's role and what we were doing

---

[152] Merrick Kelly-Robinson Dep. at 67-68 (Ex. 5 to Devlin Decl.); Hinkle Dep. at 85-86 (Ex. 20 to Devlin Decl.).
[153] Merrick Kelly-Robinson Dep. at 61-66 (Ex. 5 to Devlin Decl.); Hinkle Dep. at 82-83 (Ex. 20 to Devlin Decl.).
[154] See discussion of Request for Production No. 15.
[155] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

there."[156]    The Wellpath defendants objected to producing any information after Ms. Butterfield's death, because Mr. Mooney testified that he thought the meeting took place after Ms. Butterfield's death. [157]   Plaintiff has addressed that objection above.[158]

Plaintiff believes that this information is relevant because one of plaintiff's allegations is that all of the institutional defendants (Josephine County, Wellpath and Options) failed to coordinate their efforts and thereby ensure that the people being held in the jail were receiving constitutionally adequate medical and mental health care.  One way that they failed to coordinate care was by not meeting regularly.  Mr. Mooney has identified a single meeting where those institutional defendants got in a room to discuss their various roles and responsibilities at the jail.  If any documents exist related to that meeting, plaintiff believes that she should be able to see them.

On May 12, the Wellpath defendants agreed to follow up on this request.[159]   Plaintiff has not received any additional information.

**B.    Requests for Admission**

*1.    Request for Admission Nos. 1-3*

Plaintiff requested that each of the named defendants with EMT licenses (Dawn Case, Krystal Hulsey and Amanda Wass) admit that she "was not working under her EMT license while she was working in the Josephine County Jail from July to September 2018." The Wellpath defendants objected to these requests as "vague because working under

---

[156] Mooney Dep. at 63-64 (Ex. 30 to Devlin Decl.).
[157] See Supplemental Response to Plaintiff's Second Request for Production (Ex. 18 to Devlin Decl.).
[158] See discussion of Request for Production No. 4.
[159] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

license is not defined."[160]

In a February 12, 2022 conferral letter, plaintiff informed the Wellpath defendants that Ms. Case used the term "work under" in reference to her EMT license multiple times during her deposition. In addition, plaintiff explained that all three defendants understood the term "work under" when they answered questions during their deposition. In an effort to provide additional clarification, plaintiff directed the Wellpath defendants to a statement by the Oregon Medical Board entitled "EMS Providers Working in Other Capacities." That statement explains that an employee may not "use his or her license or title as an EMS provider" while performing certain duties in a hospital or health care setting, "even though the training he or she has received may be beneficial or even required qualifications for the employment position."[161]

On May 12, the Wellpath defendants agreed to follow up on these requests.[162] Plaintiff has not received any additional information.

### 2. *Request for Admission Nos. 13-15*

Plaintiff requested that each of the named defendants with EMT licenses (Dawn Case, Krystal Hulsey and Amanda Wass) admit that she "was an 'unregulated assistive person' as defined by OAR 851-006-0000(133) while she was working in the Josephine County Jail from July to September 2018." The Wellpath defendants responded: "Defendants object to the request because it seeks a legal conclusion. Deny."[163]

---

[160] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).
[161] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).
[162] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[163] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).

In a February 12, 2022 conferral letter, plaintiff explained that FRCP 36(a)(1)(A) states that a request for admission may relate to "facts, the application of law to fact, or opinions about either * * * ."  Plaintiff also noted that Wellpath used the similar term "unlicensed assistive personnel" on a form in Ms. Butterfield's medical file.  Amanda Wass explained during her deposition that the form "was used by anyone who was doing this assessment who was not an RN or LPN," including her.[164]

On May 12, the Wellpath defendants agreed to follow up on these requests.[165] Plaintiff has not received any additional information.

### 3.  Request for Admission No. 16

Plaintiff requested that the Wellpath defendants admit that "the rules contained in OAR Chapter 851, Division 47 applied to any delegation of nursing tasks in the Josephine County Jail from July to September 2018."  The Wellpath defendants responded: "Defendants object to the request because it is vague as to the definition of nursing tasks. Defendants further object because whether any and all delegations of tasks are controlled by the rule is a legal conclusion.  Deny."[166]

In a February 12, 2022 conferral letter, plaintiff explained the relevant OAR uses the term "tasks of nursing care" repeatedly and is entitled "Standards for Community Based Care Registered Nurse Delegation Process."  Every registered nurse who delegates tasks of nursing care is responsible for knowing these standards, including defendant Patricia

---

[164] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).
[165] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[166] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).

Shevokis.  Plaintiff also noted that the RFA relates to the application of law to fact, and therefore is permissible.[167]

On May 12, the Wellpath defendants agreed to follow up on this request.[168]  Plaintiff has not received any additional information.

### 4.  Request for Admission No. 17

Plaintiff requested that the Wellpath defendants admit that "the rules contained in OAR Chapter 851, Division 55 applied to Carly Hinkle's work as a nurse practitioner from July to September 2018."  The Wellpath defendants responded: "Admit that OAR Chapter 851, Division 55 applied to the standards and practices of nurse practitioners and that Carly Hinkle was a nurse practitioner working as a nurse practitioner from July to September 2018."[169]

In a February 12, 2022 conferral letter, plaintiff explained that the response of the Wellpath defendants did not give a clear answer.  Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[170]

On May 12, the Wellpath defendants agreed to follow up on this request.[171]  Plaintiff has not received any additional information.

---

[167] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).
[168] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[169] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).
[170] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).
[171] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

Plaintiff requested that the Wellpath defendants admit that Wellpath and/or Correct Care Solutions received a copy of certain documents from an earlier Oregon wrongful death lawsuit before July 27, 2018 (the date Janelle Butterfield was booked into the Josephine County Jail for the last time).  Plaintiff contends that the earlier lawsuit – <u>Estate of Donnie Ray Brown v. Conmed Healthcare Management, Inc., et al.</u>, U.S. District Court for the District of Oregon Case No. 6:14-cv-01620 – provided Wellpath (then known as Conmed and later as Correct Care Solutions) with notice regarding the potential problems with numerous issues involved in this case.  Those issues include the lack of a site medical director, the lack of a fully-functioning HSA, and the employment of people with EMT licenses in violation of Oregon law.  Plaintiff sent these requests for admission in order to streamline the process of proving that Wellpath received certain documents from that litigation – the 28-page summary judgment ruling by the Honorable Thomas Coffin, the 131-page memorandum filed by plaintiff opposing the summary judgment motions, and the expert reports of five experts submitted on behalf of the plaintiff.  The Wellpath defendants objected to this request, citing HIPAA and the attorney-client privilege.[172]

In a February 12, 2022 conferral letter, plaintiff explained that the requests ask the Wellpath defendants to admit publicly available facts in order to streamline the presentation of evidence at trial.  Plaintiff cited to the relevant docket entries in the court record that correlated with each request for admission.  Plaintiff then noted that the requests

---

[172] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).

did not implicate HIPAA or seek any information protected by the attorney-client privilege.[173]

On May 12, the Wellpath defendants agreed to follow up on this request.[174] Plaintiff has not received any additional information.

### 6. Request for Admission No. 28

Plaintiff requested that the Wellpath defendants admit "that, in 2018, there were no Quality Assurance Program ('QAP') meetings for the Josephine County Jail medical program. The term 'QAP' has the meaning set forth in County 001681-82." The cited pages refer to a portion of the proposal that Wellpath (then known as Conmed) submitted to Josephine County in 2012 when bidding for the jail medical contract. The contract between Josephine County and Wellpath explicitly incorporates the proposal.

The Wellpath defendants responded: "Defendants object to the request to the extent that it implies standards and requirements not described in County 001684, which speaks for itself. Defendants state that Wellpath had a quality assurance process in place in 2018. Without waiving any objection, defendants deny."[175]

In a February 12, 2022 conferral letter, plaintiff explained that the response of the Wellpath defendants was not responsive to the request. Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[176]

---

[173] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).
[174] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[175] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).
[176] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).

On May 12, the Wellpath defendants agreed to follow up on this request.[177]  Plaintiff has not received any additional information.

### 7. Request for Admission No. 29

Plaintiff requested that the Wellpath defendants admit "that, in 2018, there were no Continuous Quality Improvement ('CQI') Committee meetings for the Josephine County Jail medical program.  The term 'CQI' has the meaning set forth in County 001681-82."  The cited pages refer to a portion of the proposal that Wellpath (then known as Conmed) submitted to Josephine County in 2012 when bidding for the jail medical contract.  The contract between Josephine County and Wellpath explicitly incorporates the proposal.

The Wellpath defendants responded: "Defendants object to the request to the extent that it implies standards and requirements not described in County 001684, which speaks for itself.  Defendants state that Wellpath had a quality assurance process in place in 2018.  Without waiving any objection, defendants deny."[178]

In a February 12, 2022 conferral letter, plaintiff explained that the response of the Wellpath defendants was not responsive to the request.  Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[179]

On May 12, the Wellpath defendants agreed to follow up on this request.[180]  Plaintiff has not received any additional information.

---

[177] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[178] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).
[179] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).
[180] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

### 8. Request for Admission No. 30

Plaintiff requested that the Wellpath defendants admit "that, in 2018, there were no Medical Audit Committee ('MAC') meetings for the Josephine County Jail medical program. The term 'MAC' has the meaning set forth in County 001681-82." The cited pages refer to a portion of the proposal that Wellpath (then known as Conmed) submitted to Josephine County in 2012 when bidding for the jail medical contract. The contract between Josephine County and Wellpath explicitly incorporates the proposal.

The Wellpath defendants responded: "Defendants object to the request to the extent that it implies standards and requirements not described in County 001684, which speaks for itself. Defendants state that Wellpath had a quality assurance process in place in 2018. Without waiving any objection, defendants deny."[181]

In a February 12, 2022 conferral letter, plaintiff explained that the response of the Wellpath defendants was not responsive to the request. Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[182]

On May 12, the Wellpath defendants agreed to follow up on this request.[183] Plaintiff has not received any additional information.

### 9. Request for Admission No. 36

Plaintiff requested that the Wellpath defendants admit that "the Contract for Professional Services (the 'Contract') dated June 27, 2012 (County 000119-000129)

---

[181] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).
[182] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).
[183] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

between Conmed, Inc. and the Josephine County Board of Commissioners stated that the Contract documents included 'CONMED Professional Health Care Services Proposal submitted February 22, 2012.'" The Wellpath defendants responded: "Defendants object to the request because it seeks a legal conclusion. Defendant further state that the written contents of the Contract (County 000119-000129) speak for themselves, and that no response is required. Without waiving any objection, defendants admit that 'CONMED Professional Health Care Services Proposal submitted February 22, 2012' is listed a document [sic] on 'County 000119.'[184]

In a February 12, 2022 conferral letter, plaintiff noted that the RFA relates to the application of law to fact, and therefore is permissible. Plaintiff also explained that the Wellpath defendants cannot make the argument that the documents speak for themselves, because the Wellpath defendants have asserted in response to other discovery requests that the RFP response "is not a contract in any manner" and that the "RFP response was a proposal and does not constitute a contract." Plaintiff cited Marchand v. Mercy Medical Center,[185] in which the Ninth Circuit stated: "Parties may not view requests for admission as a mere procedural exercise requiring minimally acceptable conduct. They should focus on the goal of the Rules, full and efficient discovery, not evasion and word play." Finally, plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[186]

---

[184] See Response to Plaintiff's First Set of Requests for Admission (Ex. 21 to Devlin Decl.).
[185] 22 F.3d 933, 936-37 (9th Cir. 1994).
[186] See February 12, 2022 letter (Ex. 31 to Devlin Decl.).

On May 12, the Wellpath defendants agreed to follow up on this request.[187]  Plaintiff has not received any additional information.

> 10.  *Request for Admission Nos. 37-39*

Plaintiff requested that the Wellpath defendants admit that Wellpath made certain promises in its 2012 proposal for the jail medical contract.  The Wellpath defendants admitted the accuracy of each quote but denied "that the submission was a 'promise.'"[188] To support this objection, the Wellpath defendants cited Josephine County's initial answer to Request for Admission No. 36, denying that the proposal was included in the contract between Wellpath and Josephine County.

In a March 18, 2022 conferral letter, plaintiff noted that Josephine County intended to change its answer to Request for Admission No. 36 to admit that the proposal was included with the contract.[189]  Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[190]

On May 12, the Wellpath defendants agreed to follow up on this request.[191]  Plaintiff has not received any additional information.

> 11.  *Request for Admission No. 40*

Plaintiff requested that the Wellpath defendants admit that Dr. Vivek Shah, the regional medical director, "was the 'responsible physician' for the Josephine County Jail

---

[187] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[188] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[189] Josephine County changed its answer after conferring with plaintiff.
[190] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[191] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

from July to September 2018. The term 'responsible physician' has the meaning set forth in J-A-02 of the National Commission on Correctional Health Care <u>Standards for Health Services in Jails</u> (2014)." The Wellpath defendants provided a narrative answer rather than an objection.[192]

In a March 18, 2022 conferral letter, plaintiff noted that Wellpath is very familiar with the NCCHC Standards for Health Services in Jails. Wellpath referenced those standards in its 2012 proposal to Josephine County, and Wellpath routinely references those standards in other proposals. Wellpath employees appear at NCCHC conferences. Dr. Shah testified that he is a Certified Correctional Health Professional by the NCCHC, which involved "learn[ing] NCCHC standards" and taking a test.[193]

On May 12, the Wellpath defendants agreed to follow up on this request.[194] Plaintiff has not received any additional information.

12.    *Request for Admission No. 41*

Plaintiff requested that the Wellpath defendants admit that Dr. Vivek Shah, the regional medical director, "was the 'responsible health authority' for the Josephine County Jail from July to September 2018. The term 'responsible health authority' has the meaning set forth in J-A-02 of the National Commission on Correctional Health Care <u>Standards for Health Services in Jails</u> (2014)." The Wellpath defendants provided a narrative answer rather than an objection.[195]

---

[192] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[193] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[194] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[195] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).

In a March 18, 2022 conferral letter, plaintiff noted that Wellpath is very familiar with the NCCHC Standards for Health Services in Jails.  Wellpath referenced those standards in its 2012 proposal to Josephine County, and Wellpath routinely references those standards in other proposals.  Wellpath employees appear at NCCHC conferences.  Dr. Shah testified that he is a Certified Correctional Health Professional by the NCCHC, which involved "learn[ing] NCCHC standards" and taking a test.[196]

On May 12, the Wellpath defendants agreed to follow up on this request.[197]  Plaintiff has not received any additional information.

### 13.    Request for Admission No. 42

Plaintiff requested that the Wellpath defendants admit that Carly Hinkle, the nurse practitioner, "was the 'responsible health authority' for the Josephine County Jail from July to September 2018.  The term 'responsible health authority' has the meaning set forth in J-A-02 of the National Commission on Correctional Health Care Standards for Health Services in Jails (2014)."  The Wellpath defendants provided a narrative answer rather than an objection.[198]

In a March 18, 2022 conferral letter, plaintiff noted that Wellpath is very familiar with the NCCHC Standards for Health Services in Jails.  Wellpath referenced those standards in its 2012 proposal to Josephine County, and Wellpath routinely references those standards in other proposals.  Wellpath employees appear at NCCHC conferences.[199]

---

[196] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[197] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[198] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[199] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).

On May 12, the Wellpath defendants agreed to follow up on this request.[200]  Plaintiff has not received any additional information.

### 14.   Request for Admission No. 43

Plaintiff requested that the Wellpath defendants admit that "no one performed a 'clinical mortality review' after the death of Janelle Butterfield.  The term 'clinical mortality review' has the meaning set forth in J-A-10 of the National Commission on Correctional Health Care <u>Standards for Health Services in Jails</u> (2014)."  The Wellpath defendants denied this request and stated: "A quality assurance review was conducted and it is privileged."[201]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive, because Wellpath is very familiar with the NCCHC Standards for Health Services in Jails.  The reference to a "quality assurance review" does not answer this specific question about the requirement of an NCCHC Standard.[202]

On May 12, the Wellpath defendants agreed to follow up on this request.[203]  Plaintiff has not received any additional information.

### 15.   Request for Admission No. 44

Plaintiff requested that the Wellpath defendants admit that "no one performed a 'psychological autopsy' after the death of Janelle Butterfield.  The term 'psychological autopsy' has the meaning set forth in J-A-10 of the National Commission on Correctional

---

[200] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[201] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[202] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[203] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

Health Care Standards for Health Services in Jails (2014)."  The Wellpath defendants objected to this request "to the extent that it requires disclosure of the inner workings of the quality assurance process, which includes the manner in which the committee functions."[204]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive, because Wellpath is very familiar with the NCCHC Standards for Health Services in Jails.  The reference to a "quality assurance process" does not answer this specific question about the requirement of an NCCHC Standard.[205]

On May 12, the Wellpath defendants agreed to follow up on this request.[206]  Plaintiff has not received any additional information.

16.    *Request for Admission No. 45*

Plaintiff requested that the Wellpath defendants admit that "Janelle Butterfield did not have a 'receiving screening' after she arrived at the Josephine County Jail on July 27 2018.  The term 'receiving screening' has the meaning set forth in J-E-02 of the National Commission on Correctional Health Care Standards for Health Services in Jails (2014)." The Wellpath defendants responded: "Defendant Wellpath responds to this request for admission based on its own policy, not based on 2014 NCCHC definition of a receiving screening.  Wellpath's chart does not contain a receiving screening document."[207]

---

[204] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[205] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[206] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[207] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive, because plaintiff asked Wellpath to admit that no receiving screening was done. Wellpath responded that the medical chart does not contain a receiving screening document. Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[208]

On May 12, the Wellpath defendants agreed to follow up on this request.[209] Plaintiff has not received any additional information.

### 17. Request for Admission No. 46

Plaintiff requested that the Wellpath defendants admit that "Janelle Butterfield did not have an 'initial health assessment' during her time at the Josephine County Jail from July 27, 2018 to September 5, 2018. The term 'initial health assessment' has the meaning set forth in J-E-04 of the National Commission on Correctional Health Care Standards for Health Services in Jails (2014)." The Wellpath defendants responded: "Wellpath responds based on its own policy and operations, not on a 2014 standard. Wellpath admits that there was no documentation of an assessment within 14 days of arrival in the jail."[210]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive, because plaintiff asked Wellpath to admit that no initial health assessment was done. Wellpath responded that the medical chart does not contain an initial health assessment document. Plaintiff asked the Wellpath defendants to change the

---

[208] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[209] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[210] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).

answer to "Admit" or "Deny" without any qualifications.[211]

On May 12, the Wellpath defendants agreed to follow up on this request.[212]  Plaintiff has not received any additional information.

18.    *Request for Admission No. 47*

Plaintiff requested that the Wellpath defendants admit that "Janelle Butterfield did not have a 'mental health screening and evaluation' during her time at the Josephine County Jail from July 27, 2018 to September 5, 2018.  The term 'mental health screening and evaluation' has the meaning set forth in J-E-05 of the National Commission on Correctional Health Care Standards for Health Services in Jails (2014)."  The Wellpath defendants responded: "Wellpath incorporates by reference its responses to RFA Nos. 37-39.  There has always been a separation between the responsibilities of Wellpath and Options."[213]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not responsive, because plaintiff asked Wellpath to admit that no mental health screening and evaluation was done.   Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[214]

On May 12, the Wellpath defendants agreed to follow up on this request.[215]  Plaintiff has not received any additional information.

---

[211] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[212] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[213] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[214] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[215] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

### 19. *Request for Admission No. 48*

Plaintiff requested that the Wellpath defendants admit "that, from July 27, 2018 to September 5, 2018, a qualified health care professional did not review Janelle Butterfield's 'health record to determine whether existing medical, dental, or mental health needs' contraindicated her placement or required accommodation, as required by J-E-09 of the National Commission on Correctional Health Care Standards for Health Services in Jails (2014)." The Wellpath defendants responded: "Defendants incorporate their responses to RFA Nos. 37-39."[216]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive. Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[217]

On May 12, the Wellpath defendants agreed to follow up on this request.[218] Plaintiff has not received any additional information.

### 20. *Request for Admission No. 49*

Plaintiff requested that the Wellpath defendants admit that "Janelle Butterfield was not identified as a patient with a 'chronic disease' or enrolled in a 'chronic disease program' during her time at the Josephine County Jail from July 27, 2018 to September 5, 2018. The terms 'chronic disease' and 'chronic disease program' have the meanings set forth in J-G-01 of the National Commission on Correctional Health Care Standards for Health Services

---

[216] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[217] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[218] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

<u>in Jails</u> (2014)." The Wellpath defendants provided a narrative response and "incorporate[d] by reference their responses to RFA Nos. 37-39."[219]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive. Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[220]

On May 12, the Wellpath defendants agreed to follow up on this request.[221] Plaintiff has not received any additional information.

21.  *Request for Admission No. 50*

Plaintiff requested that the Wellpath defendants admit that "Janelle Butterfield was not identified as a 'special needs patient' during her time at the Josephine County Jail from July 27, 2018 to September 5, 2018. The term 'special needs patient' has the meaning set forth in J-G-02 of the National Commission on Correctional Health Care <u>Standards for Health Services in Jails</u> (2014)." The Wellpath defendants provided a narrative response and "incorporate[d] by reference their responses to RFA Nos. 37-39."[222]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive. Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[223]

---

[219] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[220] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[221] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[222] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[223] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).

On May 12, the Wellpath defendants agreed to follow up on this request.[224] Plaintiff has not received any additional information.

22.    *Request for Admission No. 51*

Plaintiff requested that the Wellpath defendants admit that "Janelle Butterfield did not have a 'treatment plan' during her time at the Josephine County Jail from July 27, 2018 to September 5, 2018. The term 'treatment plan' has the meaning set forth in J-G-02 of the National Commission on Correctional Health Care <u>Standards for Health Services in Jails</u> (2014)." The Wellpath defendants responded: "See response to RFA Nos. 37-39 and 50. Janelle Butterfield did not have a physical condition that necessitated the creation of a treatment plan."[225]

In a March 18, 2022 conferral letter, plaintiff explained that this answer was not proper or responsive. Plaintiff asked the Wellpath defendants to change the answer to "Admit" or "Deny" without any qualifications.[226]

On May 12, the Wellpath defendants agreed to follow up on this request.[227] Plaintiff has not received any additional information.

**C.    Additional Requests for Production**

1.    *Request for Production No. 65*

As noted above, the Wellpath defendants responded to Request for Admission Nos. 28-30 by stating: "Wellpath had a quality assurance process in place in 2018." In response,

---

[224] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[225] See Response to Plaintiff's Third Set of Requests for Admission (Ex. 32 to Devlin Decl.).
[226] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[227] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

plaintiff requested "all documents related to the 'quality assurance process in place in 2018' referenced in your responses to Request for Admission Nos. 28-30." The Wellpath defendants objected to this request as vague and overbroad, and also cited the PSQIA.[228]

In a March 18, 2022 conferral letter, plaintiff noted that the request could not be vague or overbroad, because it simply referenced language used by the Wellpath defendants in their discovery response. Plaintiff also noted that Wellpath must establish that it followed the requisite procedures to quality for PSQIA protection.[229]

On May 12, the Wellpath defendants agreed to follow up on this request.[230] Plaintiff has not received any additional information.

### 2.     *Request for Production No. 66*

Plaintiff requested "all documents related to the meetings referenced in your response to Request for Admission No. 31." The Wellpath defendants objected to this request as vague and overbroad, and also cited the PSQIA. The Wellpath defendants then stated: "Subject to and without waiving the stated objections, Defendants will produce all non-privileged documents."[231]

In a March 18, 2022 conferral letter, plaintiff noted that the request could not be vague or overbroad, because it simply followed up on the Wellpath defendants' denial of a request to admit that certain meetings referenced in the 2012 proposal had not taken place. By denying that request for admission, the Wellpath defendants indicated that the meetings

---

[228] See Response to Plaintiff's Fourth Request for Production (Ex. 34 to Devlin Decl.).
[229] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[230] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[231] See Response to Plaintiff's Fourth Request for Production (Ex. 34 to Devlin Decl.).

had taken place. Plaintiff also noted that Wellpath must establish that it followed the requisite procedures to quality for PSQIA protection or to qualify for other privileges. Finally, plaintiff asked the Wellpath defendants to produce whatever documents they intended to produce.[232]

On May 12, the Wellpath defendants agreed to follow up on this request.[233] Plaintiff has not received any additional information.

### 3. *Request for Production No. 67*

Plaintiff requested "all documents related to the discussions referenced in your response to Request for Admission No. 32." The Wellpath defendants objected to this request as vague and overbroad, and also cited the PSQIA. The Wellpath defendants then stated: "Subject to and without waiving the stated objections, Defendants will produce all non-privileged documents."[234]

In a March 18, 2022 conferral letter, plaintiff noted that the request could not be vague or overbroad, because it simply followed up on the Wellpath defendants' denial of a request to admit that certain discussions referenced in the 2012 proposal had not taken place. By denying that request for admission, the Wellpath defendants indicated that the discussions had taken place. Plaintiff also noted that Wellpath must establish that it followed the requisite procedures to quality for PSQIA protection or to qualify for other privileges. Finally, plaintiff asked the Wellpath defendants to produce whatever

---

[232] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[233] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[234] See Response to Plaintiff's Fourth Request for Production (Ex. 34 to Devlin Decl.).

documents they intended to produce.[235]

On May 12, the Wellpath defendants agreed to follow up on this request.[236]  Plaintiff has not received any additional information.

### 4. *Request for Production Nos. 68-69*

Plaintiff requested "all documents related to the "quality assurance process" and "notes" referenced in your response to Request for Admission" No. 33 and No. 34.  The Wellpath defendants objected to this request as vague and overbroad, and also cited the PSQIA.  The Wellpath defendants then stated: "Subject to and without waiving the stated objections, Defendants will produce all non-privileged documents and notes."[237]

In a March 18, 2022 conferral letter, plaintiff noted that the request could not be vague or overbroad, because it simply followed up on the Wellpath defendants' denial of a request to admit that Wellpath was not maintaining minutes or summaries of the referenced meetings.  The Wellpath defendants stated: "Wellpath had a quality assurance process and that Wellpath created notes."  Plaintiff also noted that Wellpath must establish that it followed the requisite procedures to quality for PSQIA protection or to qualify for other privileges.  Finally, plaintiff asked the Wellpath defendants to produce whatever documents they intended to produce.[238]

---

[235] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[236] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[237] See Response to Plaintiff's Fourth Request for Production (Ex. 34 to Devlin Decl.).
[238] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).

On May 12, the Wellpath defendants agreed to follow up on these requests.[239] Plaintiff has not received any additional information.

## 5. Request for Production No. 70

Plaintiff requested "all documents related to the statistical reports referenced in your response to Request for Admission No. 35." The Wellpath defendants objected to this request as vague and overbroad, and also cited attorney-client privilege. The Wellpath defendants then stated: "Subject to and without waiving the stated objections, Defendants will produce all non-privileged documents."[240]

In a March 18, 2022 conferral letter, plaintiff noted that the request could not be vague or overbroad, because it simply followed up on the Wellpath defendants' denial of a request to admit that Wellpath was submitting statistical reports referenced in the 2012 proposal. By denying that request for admission, the Wellpath defendants indicated that the statistical reports had been submitted. Plaintiff also questioned how the attorney-client privilege could apply to any statistical reports given by Wellpath to Josephine County. Finally, plaintiff asked the Wellpath defendants to produce whatever documents they intended to produce.[241]

On May 12, the Wellpath defendants agreed to follow up on this request.[242] Plaintiff has not received any additional information.

---

[239] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[240] See Response to Plaintiff's Fourth Request for Production (Ex. 34 to Devlin Decl.).
[241] See March 18, 2022 letter (Ex. 33 to Devlin Decl.).
[242] See May 12, 2022 email (Ex. 14 to Devlin Decl.).

**D.    Deposition Scheduling**

Plaintiff has taken 23 complete depositions and 2 incomplete depositions in this case.  The parties have several additional depositions scheduled during the week of July 11.  Counsel for plaintiff and counsel for the Wellpath defendants have one remaining issue regarding deposition scheduling.

Plaintiff asks the Court to compel the deposition of a Wellpath witness named Mandy Forsmann.  Plaintiff has agreed to limit this deposition to two hours.  Ms. Forsmann was the supervisor for Patricia Shevokis (the RN who ran the day-to-day operations of the Wellpath medical program) at some point during the approximately three-year period that Ms. Shevokis served in that role.   Plaintiff wants to ask Ms. Forsmann about her supervision of Ms. Shevokis, including but not limited to any staffing coverage while Ms. Shevokis was away from the jail on vacation or on leave and any performance issues related to Ms. Shevokis.  Plaintiff first requested this deposition in November 2021.

In March, counsel for the Wellpath defendants stated that "Wellpath has **no record** that Mandy ever worked for the company."[243]  Counsel for plaintiff responded by sending a Wellpath document describing Ms. Forsmann as "Regional Manager for Oregon and Washington * * * responsible for operational and clinical oversight of HSAs and DONs in her region" as well as a resume for Ms. Forsmann clearly listing her as a Wellpath (then known as Correct Care Solutions) employee.[244]

---

[243] See March 15, 2022 email (Ex. 35 to Devlin Decl.) (emphasis in original).
[244] See March 17, 2022 email (Ex. 36 to Devlin Decl.).

During the May 12 Zoom conference, counsel for the Wellpath defendants indicated that they did not object to Ms. Forsmann's deposition.[245] Four days later, counsel for the Wellpath defendants stated that "Mandy Forsmann was not the Regional Supervisor during the subject timeframe" and declined to make her available.[246]

Plaintiff is not limiting her request to the supervisor of Ms. Shevokis during Ms. Butterfield's final incarceration in the jail. As noted above, Ms. Shevokis' performance as HSA is a critical issue in this case. Plaintiff wants to take a limited deposition of one of the people who supervised her in that role.

### E. Deposition Questions

#### 1. Questions about prior lawsuits

During the deposition of Dr. Vivek Shah, counsel for the Wellpath defendants objected to questions about lawsuits involving other incarcerated people.

<u>First</u>, plaintiff asked about a lawsuit filed by the Estate of Christina Boshears in the United States District Court for the Western District of Washington in December 2016.[247] Ms. Boshears died of heroin withdrawal in the Kitsap County Jail in December 2013. Dr. Shah was a named defendant in the <u>Boshears</u> case, and he was deposed in that case. Counsel for the Wellpath defendants instructed Dr. Shah not to answer questions about the <u>Boshears</u> case [248]

---

[245] See May 12, 2022 email (Ex. 14 to Devlin Decl.).
[246] See May 16, 2022 email (Ex. 36 to Devlin Decl.).
[247] See Second Amended Complaint, <u>Boshears v. Kitsap County, et al.</u>, United States District Court for the Western District of Washington Case No. 3:16-cv-06012 (Ex. 38 to Devlin Decl.).
[248] Shah Dep. at 7-9 (Ex. 19 to Devlin Decl.).

**Second**, plaintiff asked about a lawsuit filed by Susan Whalen, as legal guardian for Amy Schwirse, in December 2018.[249] Between January 2016 and June 2017, Ms. Schwirse did not receive proper medical or mental health care for her serious mental illness. Dr. Shah was a named defendant in the Whalen case, and he was deposed in that case. Counsel for the Wellpath defendants instructed Dr. Shah not to answer questions about the Whalen case.[250]

**Third**, plaintiff asked about a lawsuit filed by Michelle Bolden, as legal guardian for William Derby, in April 2019.[251] In April 2017, Mr. Derby did not receive proper medical or mental health care for his serious mental illness, leading to a suicide attempt and a trip to the Oregon State Hospital. Dr. Shah was a named defendant in the Bolden case. During his deposition, counsel for the Wellpath defendants instructed Dr. Shah not to answer questions about the Bolden case.[252]

As noted above, plaintiff believes that prior lawsuits are relevant because one of the ways that a plaintiff can establish a Monell claim is to demonstrate a pattern and practice of similar conduct by Wellpath.[253] Dr. Shah (the regional medical director) was a named defendant in three cases where the critical events took place before Ms. Butterfield's death. Prior lawsuits also provide notice to Wellpath that support negligence and punitive damages claims.

---

[249] See Complaint, Whalen v Columbia County, et al., United States District Court for the District of Oregon Case No. 3:18-cv-02090 (Ex. 39 to Devlin Decl.).
[250] See Shah Dep. at 141-144 (Ex. 19 to Devlin Decl.).
[251] See Complaint, Bolden v. Columbia County, et al., United States District Court for the District of Oregon Case No. 3:19-cv-00555 (Ex. 40 to Devlin Decl.).
[252] See Shah Dep. at 141-144 (Ex. 19 to Devlin Decl.).
[253] See discussion of Request for Production No. 15.

Plaintiff contends that these deposition questions do not violate HIPAA because plaintiff is not seeking any "health information" about the plaintiffs in the other lawsuits.[254] Rather, plaintiff wants to ask Dr. Shah about his knowledge of the publicly available facts in those three cases.

### 2. Questions about discussions after Ms. Butterfield's death

During the deposition of Patricia Shevokis, counsel for the Wellpath defendants objected to questions about a phone call among Wellpath employees to discuss Ms. Butterfield's death. Ms. Shevokis testified that there was "a phone conference" with only Wellpath employees to discuss Ms. Butterfield's death. After taking a break to confer with Ms. Shevokis, counsel for the Wellpath defendants objected to any questions regarding that conference "[b]ased on the Peer Review Quality Assurance and the Patient Safety Act."[255]

As noted above, Wellpath bears the burden of establishing that it has met the requirements to qualify for PSQIA protection.[256] Wellpath has not made that showing in this case.

---

[254] See 42 U.S.C. § 1320d(4)(A) ("The term 'health information' means any information, whether oral or recorded in any form or medium, that * * * is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse * * * .").
[255] Shevokis Dep. at 90-93 (Ex. 22 to Devlin Decl.).
[256] See discussion of Request for Production No. 20.

## <u>CONCLUSION</u>

For the reasons set forth above, plaintiff asks this Court to grant the motion to compel.

DATED this 17th day of June, 2022.

LAW OFFICE OF CHAD STAVLEY, P.C.

/s/  Chad Stavley
_____
Chad Stavley, OSB No. 034656
Email: chad@stavleylaw.com

DEVLIN LAW, PC

/s/  John Devlin
_____
John T. Devlin, OSB No. 042690
Email: john@johndevlinlaw.com

Of Attorneys for Plaintiff