IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

CONNIE DENCE, personal representative for the
Estate of JANELLE MARIE BUTTERFIELD,
deceased,

        Plaintiff,

v.

WELLPATH, LLC,
CORRECT CARE SOLUTIONS, LLC,
CARLY HINKLE, DAWN CASE,
OPTIONS FOR SOUTHERN OREGON, INC.,
MERRICK KELLY-ROBINSON,
JOSEPHINE COUNTY,
DAVE DANIEL, AMANDA WASS,
KRYSTAL HULSEY, VIVEK SHAH,
PATRICIA SHEVOKIS, ED VINCENT,
CLINT MOONEY,

        Defendants.

Case No: 1:20-cv-00671-CL

**FINDINGS AND RECOMMENDATION**

---

**CLARKE**, Magistrate Judge

Plaintiff Connie Dence, on behalf of the Estate of Janelle Marie Butterfield, ("Plaintiff") moves for entry of terminating sanctions against Defendants Wellpath, LLC and Correct Care Solutions, LLC ("Wellpath Defendants"). Pl. Mot., ECF No. 142. Oral argument was held on December 12, 2023. For the reasons below, Plaintiff's Motion should be GRANTED.

**INTRODUCTION**

Janelle Marie Butterfield was incarcerated at the Josephine County Jail when she died by suicide. Her family initiated the instant lawsuit shortly after, alleging that Defendants' treatment

1 – FINDINGS AND RECOMMENDATION

of Ms. Butterfield during her incarceration was negligent and violated her civil rights. Discovery revealed that the Wellpath Defendants instituted a company-wide email "purge" policy that resulted in the permanent deletion of emails from six of the named Defendants. Plaintiff now moves for sanctions and requests an entry of default judgment against the Wellpath Defendants.

## BACKGROUND

Ms. Butterfield was booked into the Josephine County Jail on July 27, 2018, for failing to appear on misdemeanor charges. Defs. Answer, ECF No. 50 at ¶ 2. At the time, Ms. Butterfield demonstrated signs of severe mental illness. FAC, ECF No. 36 at ¶¶ 71-75; Defs. Resp., ECF No. 150 at 7. The degree of medical care offered to Ms. Butterfield throughout her incarceration is a contested issue in this case. However, after 40 days in her cell, Ms. Butterfield died by suicide on September 5, 2018. ECF No. 50 at ¶ 2.

Josephine County Jail provides medical services to its inmates through Defendants Correct Care Solutions and their successor in interest, Wellpath. Fisher Decl., ECF No. 153 at ¶ 4. Individual Defendants Carly Hinkle, Dawn Case, Krystal Hulsey, Amanda Wass, Vivek Shah, and Patricia Shevokis are current and former Wellpath employees who were involved, directly or indirectly, in Ms. Butterfield's health care or post-mortem review. ECF No. 150 at 7. Carly Hinkle was employed as a nurse practitioner. ECF No. 36 at ¶ 6; ECF No. 50 at ¶ 6. Dawn Case, Krystal Hulsey, and Amanda Wass were employed as EMT/CMAs. ECF No. 36 at ¶¶ 7-9; ECF No. 50 at ¶ 6. Dr. Vivek Shah was Wellpath's Medical Director at the Josephine Country Jail and Patricia Shevokis was the Health Services Administrator. ECF No. 36 at ¶¶ 10-11; ECF No. 50 at ¶ 6.

On September 6, 2018, the Oregon State Police conducted an investigation into Ms. Butterfield's death. Devlin Decl., ECF No. 143-7. Defendant Wass was interviewed as part of

2 – FINDINGS AND RECOMMENDATION

that investigation. *Id.* at 9. Stefan Cange, Wellpath's in-house legal counsel, was also present for the interview. *Id.* On October 3, 2018, Mr. Cange, Defendant Shevokis, and several other members of Wellpath's senior staff attended a Wellpath Mortality Review regarding Ms. Butterfield's death. ECF No. 143-8. The Review produced a three-part assessment including patient information, a mortality and morbidity review meeting, and a report and recommendation. ECF No. 143-9. That Review was submitted to Wellpath's Regional Operations Manager in early March 2019. ECF No. 143-11.

On March 19, 2019, counsel representing the Estate of Ms. Butterfield ("Devlin Law") allegedly faxed a preservation letter to Wellpath, directing them to "preserve all evidence and information related to Ms. Butterfield." ECF No. 143-12. Plaintiff has submitted an email evincing a successful fax transmission, *see* ECF No. 143-13, but Wellpath Defendants claim they cannot confirm receipt of this letter, *see* ECF No. 143-14.

On July 10, 2019, Wellpath was served with a tort claims notice ("the Notice") from Devlin Law. ECF No. 143-14. The Notice indicated that Devlin Law would be representing the Estate of Ms. Butterfield in claims against Wellpath (previously, Conmed) for deficient medical services provided to her during the period she was incarcerated up to her suicide. ECF No. 143-16. It stated that any claims for damages will be made against Wellpath, as well as any Wellpath employees who caused damage to Ms. Butterfield. *Id.* at 4. It demanded that all relevant evidence be protected and preserved. *Id.*

Wellpath's Claims Department opened a claim for the Butterfield incident two weeks later, on July 24, 2019. ECF No. 143-17. Despite receiving the Notice and opening the claim, Wellpath did not place a legal hold on emails or inboxes connected to the incident, contrary to their email retention policy.

3 – FINDINGS AND RECOMMENDATION

Wellpath began developing an email retention policy back in 2015. Chamberlain Decl., ECF No. 155 at ¶ 5. On March 8, 2019, Wellpath announced it would be implementing a new company-wide email retention program ("the Policy"). *See* ECF No. 143-19. Under the Policy, "Inbox" and "Sent Items" were retained for 1 year and "Deleted Items" for 180 days, at which point any emails exceeding those durations were permanently deleted. *Id.* The Policy had an exception for emails placed on "legal hold." ECF No. 155 at 29 (Ex. 6). Legal holds were intended to preserve relevant documents once litigation, an audit, or a governmental investigation was reasonably anticipated. *Id.* Any emails denoted with a legal hold were retained until the legal hold was reviewed by the legal department. Similar rules applied to email accounts of former employees. Starting in February 2019, the email account of any employee who had been terminated longer than one year was permanently deleted, unless it was placed on legal hold. ECF No. 143-22 ¶ 4; *see also* ECF No. 143-21 at 15 (Depo. pgs. 47–48).

The Policy was conceived and approved by a handful of Wellpath's senior staff: Executive VP David Perry, CIO Robert Martin, the CEO, and members of the executive team. ECF No. 143-21 at 29 (Depo. pg. 104). Its architects referred to the Policy internally as the "purge." ECF No. 143-23. Mr. Martin explained that prior to 2019, it was Wellpath's standard practice to retain emails sometimes for 10 to 12 years, which allegedly resulted in a large email store that caused delays and IT difficulties. ECF No. 143-21 at 16–17 (Depo. pgs. 53–54); *see also* Martin Decl., ECF No. 156. In explaining the choice to implement the Policy, Mr. Martin responded with the following:

> **Q: Why did CHC and CCS and Wellpath implement this new policy in early 2019?**
>
> A: So the company is always reviewing, you know, kind of our processes and practices against – best practices for businesses in general, and this was a gap. I mean, we did not have a policy. So, you know, it's best practice to have a policy. The email store is

very, very large at that point, so there's costs and risks and just -- just a business need to have policies around how long you retain your emails and other documents. And so, you know, the business driver was this became something that we needed to do, along with many other things, as the business got to a certain size.

**Q: What were the risks associated with simply continuing with the old policy by retaining all emails?**

A: Well, I mean, I think there's discovery risks and costs associated with that if you don't manage it, you know, in a standard way, right, and so just formalizing that so that we could communicate between ourselves and with outside folks in a standard way around retention.

**Q: What do you mean by "discovery risks"?**

A: Well, we're here today over this very topic, right? And, you know, there's competing business needs in a business for the preservation of documents for different stakeholders. And the company has to find ways to balance those costs and those risks.

**Q: I mean, prior to early 2019, all emails were retained. What was the problem with that?**

A: Well, it's very costly to do. Everything you do is exponentially more difficult when you have such a large number of emails. And the information contained in that -- in emails can be good or bad, right, depending on many, many factors. So I don't think it's unusual for a business to do that. This is a normal thing businesses do is have policies around document retention and email retention.

**Q: Was it part of the motivation of CCS and CHC and Wellpath in early 2019 that there should be a system in place to automatically delete older emails in case, for example, there were any bad emails out there?**

A: I wouldn't say that was –

[Objection to Form]

A: I wouldn't say that was a primary consideration, but it's certainly a consideration.

[ ]

**Q: And did CHC and CCS and Wellpath take that into account in making the decision to implement that policy in March of 2019?**

> [Objection to Form]
>
> A: It was a factor for sure

ECF No. 143-21 at 14–15 (Depo. pgs. 44–46). Before launching the Policy, Wellpath's Director of Claims Management sent an email to outside counsel requesting they verify all open cases to "ensure key information is not being deleted from the preservation process." ECF No. 143-26. This request was followed up with additional confirmatory emails to legal counsel. ECF Nos. 155-9–155-18.

The first round of clearings was completed by May 2019. ECF No. 143-21 at 18 (Depo. pgs. 58–59). It destroyed millions of emails. *Id.* Wellpath did not, in the ordinary course of business, maintain a record specifically identifying which and who's emails were deleted under the Policy. ECF No. 150 at 15; *see also* ECF No. 143-31 at 2. It is Wellpath's "best estimate" that majority of the emails of Defendants Case, Hinkle, Hulsey, and Wass were deleted in the first round of clearings. ECF No. 150 at 15.

Plaintiff asserts, however, that it is more likely the first round missed any emails that arose out of Ms. Butterfield's case. ECF No. 142 at 16. Per the Policy's terms, emails without legal holds were deleted on a rolling basis when they reached maturity at one year. Given that Ms. Butterfield's custody started on July 27, 2018, the emails related to her case would not have begun to expire until July 27, 2019. Emails related to her suicide would not have begun to expire until September 5, 2019. The emails thus likely survived the first round in May and existed when Wellpath received the Notice on July 10, 2019, and opened a claim on July 24, 2019.

In December 2019, Wellpath's IT Security Manager noticed that old employee mailboxes were not being removed and requested an automated system to eliminate user error. ECF No. 143-32. Wellpath's VP for Information Technology responded with the following:

> Please do NOT simply delete the aged boxes and reply to Richard that this is done. Now that we've deleted old email there is a lot of scrutiny on email retention. Richard has had to make a sworn court attestation regarding it and Bob is being deposed by opposing council on a lawsuit, regarding email retention. So the procedures must be clear on this, and must be followed to the letter. The procedure needs to clearly stated [sic] how the mailboxes that are on legal hold will be excluded from the set of mailboxes to be deleted. We want to review and approved [sic] the procedure before and [sic] deletion activity is started.

*Id.*

Wellpath was engaged in two similar lawsuits during this time. On October 30, 2018, the Estate of the deceased inmate Marc Moreno filed a lawsuit in the Eastern District of Washington. *See Estate of Moreno v. Correctional Healthcare Cos., Inc.*, NO: 4:18-CV-5171-RMP, 2020 WL 5740265 (E.D. Wash. June 1, 2020) (ECF No. 143-37) (hereinafter, *Moreno*). On November 21, 2019, the Estate of the deceased inmate Rocky Stewart filed a lawsuit in the District of Oregon. *See Johnson for Estate of Stewart v. Coos County*, No. 6:19-cv-01883-AA, 2023 WL 4002680 (D. Or. June 14, 2023) (ECF No. 143-51) (hereinafter, *Stewart*). Both lawsuits arose out of analogous facts involving a deceased inmate under the care of Wellpath staff, and both ended with terminating sanctions against Wellpath for the intentional destruction of email evidence.

Despite ongoing cases, Wellpath conducted a second round of clearings on April 6, 2020. ECF No. 143-34. This round automatically deleted mailboxes without legal holds that had matured for more than one year. ECF No. 143-33. The mailboxes of Defendants Shevokis, Wass, Hulsey, and Case were permanently deleted in this round. ECF No. 143-35 at 3, 19, 92, 98. Wellpath claims there were likely no more than 60 emails existing for Ms. Shevokis and no more than 30 for Ms. Wass at this time. ECF No. 150 at 15.

The *Moreno* plaintiffs learned Wellpath had destroyed discoverable emails and moved for terminating sanctions on April 23, 2020. ECF No. 143-36. On June 1, 2020, Judge Rosanna

Malouf Peterson entered a default judgment against the Wellpath Defendants, finding that they had intentionally destroyed evidence and hindered the litigation process with misleading delays. *Moreno*, 2020 WL 5740265 at *7 (ECF No. 143-37).

Wellpath halted the Policy following the *Estate of Moreno* decision. The CLO emailed the following request on August 15, 2020:

> [I]n light of this issue, which has the potential to be very negative for some of our litigated claims, I am asking you to immediately suspend our electronic document retention policy. No emails should be deleted, automatically or otherwise, until we get this properly assessed and worked out. Please confirm back to me that this suspension can be, and has been, implemented. Sorry for the inconvenience but we simply have to do this.

ECF No. 143-38. Wellpath's IT Department placed 100% of the mailboxes in the system on litigation hold to ensure their retention. ECF No. 143-39. By this time, however, Wellpath maintains that little to no emails remained with respect to the named Defendants. ECF No. 143-40 at 4–5.

This lawsuit was filed on April 22, 2020. ECF No. 1. The first discovery request was served on September 24, 2020, to all Defendants, seeking relevant electronically stored information, including emails. ECF No. 143-41. Wellpath Defendants responded in November 2020 without mentioning the Policy. ECF No. 143-42. From 2021 to 2022, Wellpath hired an outside firm called KPMG to conduct an audit of its legal holds and email retention practices. ECF No. 153 at ¶ 8. This decision was made in part because of the *Moreno* holding. ECF Nos. 143-44, 143-46. The results of this audit confirmed that no legal hold was ever placed on Ms. Butterfield's claim, allowing the conclusion that all corresponding emails from the six named Defendants would have been deleted under the Policy. ECF No. 143-47. Still nothing was communicated to Plaintiff.

In March 2022, Plaintiff expressed confusion over the lack of emails, specifically those relating to Ms. Shevokis's employment. ECF No. 143-54. In June 2022, Plaintiff filed a motion to compel on the same issues. ECF No. 83. In September 2022, Plaintiff raised concerns regarding the *Moreno* decision and ongoing electronic discovery issues. *See* ECF No. 143-58. In November 2022, Plaintiff communicated the "need to know whether their emails (referring to the six named Defendants) still exist to be searched." ECF No. 143-62. In December 2022, Plaintiff provided a list of search terms to yield the sought after discovery, *see* ECF No. 143-65, and requested the dates of litigation holds for emails of the named Defendants, *see* ECF No. 143-63. In January 2023, Plaintiff served another discovery request focused on the email issue, and when Defendants responded, Plaintiffs pointed out that the litigation hold issue had still not been addressed. ECF No. 143-66. Month after month Wellpath responded to requests without any mention that the sought after emails were likely destroyed under the Policy. In January 2023, Wellpath requested a second extension to reply to the discovery order. ECF No. 120.

Wellpath throughout this time was waging a similar discovery battle in its other lawsuit, *Stewart*. The first request for production was served on July 30, 2020, and discovery continued until February 2023, at which point Wellpath informed or confirmed for plaintiff that the Policy had permanently deleted many of the sought after emails. *Stewart*, 2023 WL 4002680 at *3–4.

Wellpath responded to Plaintiff in this case as well. In February 2023, roughly three years into discovery, Wellpath responded to Plaintiff's email-related discovery requests and produced responsive documents. At that point, Plaintiff learned or confirmed the following: (1) Wellpath received the July 2019 tort claims notice, (2) Wellpath's claims department opened a claim related to Ms. Butterfield's death in July 2019, (3) Wellpath never placed a litigation hold in connection with Ms. Butterfield's death, (4) the emails of the six named Defendants were deleted

on a rolling basis after July 2019, (5) Wellpath permanently deleted the email boxes of Ms. Sauerbry, Ms. Wass, Ms. Hulsey, and Ms. Case in April 2020, (6) Wellpath paused its email purge policy in August 2020 but prior to that pause, Wellpath permanently deleted all or almost all the emails of Dr. Vivek Shah and Ms. Hinkle, and (7) Wellpath knew of these facts while counsel was conferring with Plaintiff's counsel about discovery since November 2020. ECF No. 142 at 29–30; *see also* ECF Nos. 143-31, 143-40, 143-67.

The *Stewart* plaintiff moved for terminating sanctions on March 10, 2023. ECF No. 143-50. Judge Anne Aiken granted the motion and entered default judgment against Wellpath on June 14, 2023, finding that Wellpath had intentionally destroyed the emails intending to deprive plaintiff of their use in litigation and purposefully delayed the litigation by failing to acknowledge the destruction.

This Motion for Sanctions followed on August 11, 2023.

## DISCUSSION

First, the Court recommends granting Plaintiff's Motion for Sanctions and entering a default judgment against the Wellpath Defendants.[1] Second, the Court recommends denying Wellpath Defendants' Evidentiary Objections filed in opposition to Plaintiff's Motion.

### I. Plaintiff's Motion for Sanctions (#142) should be granted.

Plaintiff seeks entry of terminating sanctions against Wellpath Defendants for their failure to preserve electronically stored information ("ESI") pursuant to Federal Rule of Civil Procedure 37(e)(2)(c).

---

[1] Plaintiff originally sought entry of default judgment as to all Wellpath Defendants, including the six individual Defendants. ECF No. 142 at 60. Plaintiff has since withdrawn that request in acknowledgement of Judge Karen Immergut's order on reconsideration. *See* Pl. Reply, ECF No. 168 at 2. This Findings and Recommendation therefore only addresses default judgment as to the Wellpath Defendants, Wellpath, LLC and Correct Care Solutions, LLC.

10 – FINDINGS AND RECOMMENDATION

### a. Rule 37

Rule 37(e) permits the imposition of sanctions where (1) ESI that should have been preserved in the anticipation of litigation (2) is lost due to a party's failure to take reasonable steps to preserve it, and (3) it cannot be restored. Fed. R. Civ. Pro. 37(e). If the court finds that the party acted with the intent to deprive another of the ESI's use in litigation, the court may enter a default judgment. Fed. R. Civ. Pro. 37(e)(2)(c). Intent does not require—and is rarely susceptible to—direct proof. *Estate of Hill*, No. 2:20-CV-00410-MKD, 2022 WL 1464830, at *12 (E.D. Wash. May 9, 2022). Rather, a party's conduct satisfies Rule 37(e)(2)'s "intent requirement when the evidence shows, or it is reasonable to infer that the party purposefully destroyed evidence to avoid its litigation obligation." *Estate of Stewart*, 2023 WL 4002680 at *7 (quoting *Estate of Moreno*, 2020 WL 5740265 at *6). Where such intent is found, the court need not find that the requesting party was prejudiced by the destruction. *Id.*

### i. Wellpath should have preserved the emails for litigation.

"[T]he duty to preserve evidence attaches when a party knows or should know that such evidence may be relevant to litigation that is 'anticipated' or 'reasonably foreseeable.'" *Fog Cap Acceptance, Inc. v. Verizon Bus. Network Servs., Inc.*, No. 3:11-CV-724-PK, 2014 WL 6064217, at *7 (D. Or. Nov. 12, 2014) (original citations omitted).

Wellpath argues its duty to preserve did not attach until July 10, 2019, when it received the Notice, at which point "a significant number of emails" had already been deleted in the May 2019 clearings, absolving them of their obligation to place any legal holds.

The Court is unconvinced. Without a record of which emails were deleted when, the Court is left to apply the Policy's terms and conclude that the emails were deleted on a one-year rolling basis: emails related to Ms. Butterfield's custody began disappearing on July 27, 2019,

and emails related to her suicide began disappearing on September 5, 2019. Accepting that as true, discoverable emails would have existed when Wellpath received the Notice on July 10, 2019, at which point Wellpath had a duty to place a legal hold on them. Wellpath's failure to do so resulted in further destruction during the second round of clearings which undisputedly deleted the inboxes of four of the named Defendants.[2] Because emails relevant to Ms. Butterfield's case existed when Wellpath received the Notice, the Court finds that Wellpath had a duty to preserve them prior to their destruction.

### ii. *Wellpath failed to take reasonable steps to preserve the emails.*

At no point during the infancy of this lawsuit did Wellpath place a legal hold on any emails or inboxes connected to the Butterfield incident. It was not until the general company-wide pause in August 2020, four months after this lawsuit was filed, that Wellpath placed any legal hold on emails possibly concerning Ms. Butterfield. The Court can find no reasonable explanation for why the Wellpath Claims Department was able to open a claim for Ms. Butterfield in response to the Notice, but not place a single legal hold in relation. It is particularly perplexing considering the fact that the legal hold system was theoretically put in place for this exact reason. No further information or confirmation from outside counsel was necessary to prompt Wellpath into placing a legal hold on an incident which Wellpath was fully aware was actively being investigated and directly related to its staff. Wellpath disputes the issue, arguing that an email retention policy that deletes unnecessary, cumbersome emails is a reasonable

---

[2] The Court further disagrees that Wellpath's duty was not triggered until the Notice. In the months following Ms. Butterfield's suicide, Wellpath's employees, senior members, and legal counsel were actively engaged in responding to the incident: they participated in police interviews, internal patient reviews, reports and recommendations, meetings, issuing medical records to Ms. Butterfield's family, and, although Wellpath can neither confirm nor deny its receipt, a letter was successfully faxed to Wellpath requesting the preservation of evidence on March 19, 2019. Given the degree of Wellpath's involvement in the events following Ms. Butterfield's death, Wellpath should have known by March that litigation was reasonably foreseeable and that the emails of individuals directly involved in her care may be relevant to the case.

12 – FINDINGS AND RECOMMENDATION

measure for a business of its size to employ. This skirts the issue. Wellpath's fault does not lie in its decision to implement a policy. The fault lies in Wellpath's decision to implement the Policy with a conscious disregard to the legal hold system and its legal obligation to retain discoverable evidence. The Court finds that Wellpath did not take any reasonable measures, despite them being available, to preserve the discoverable email evidence in this case.

### iii. *The emails cannot be restored or replaced.*

The emails cannot be restored; it is less clear whether they can be replaced. Given that they no longer exist, it is difficult to discern whether a replacement would be sufficient or even possible. The massive volume of emails deleted over the course of two years, however, indicates that whatever emails are remaining are likely far from complete. For this reason, the Court is unpersuaded by Wellpath's argument that many of the emails can simply be found in the email boxes of other employees. Plaintiff moreover points out that the three years spent in discovery attempting to retrieve specific emails demonstrates that were such emails replaceable, an adequate replacement would have been produced. Wellpath's opportunity to locate and produce those replacements has passed. There are simply holes now. And as Plaintiff suggests, testimony cannot fill those holes. Unlike a contemporaneous email, testimony suffers from hindsight and requires accurate recall, which is further defeated by the substantial passage of time and erosion of trust that has occurred between the two parties. The Court therefore finds that the emails cannot be adequately replaced without great prejudice to Plaintiff.

### iv. *Intent*

Having found the elements of Rule 37 satisfied, the Court turns to the question of intent. Wellpath argues that default judgment is an improper sanction because Plaintiff cannot establish that Wellpath intentionally destroyed the evidence to deprive Plaintiff from using it at trial.

13 – FINDINGS AND RECOMMENDATION

The Court agrees that, as to the question of intent, the timeline in this case presents a closer call than those in *Moreno* and *Stewart*. Nonetheless, the Court finds that a wholistic view of the facts gives rise to the reasonable inference that Wellpath acted purposefully to avoid its litigation obligation.

In *Moreno*, the court inferred intent based on a combination of the Policy's timing, Mr. Martin's deposition, and the parties' discovery. Wellpath was facing multiple discovery requests and a motion to compel when it decided to implement the Policy and destroy millions of discoverable emails germane to the case. The court noted: "This is not a case where Defendants negligently forgot to stop an automatic document destruction system already in place. Rather, this is a case in which Defendants decided to begin a new document destruction policy in the middle of litigation over a teenager's death." *Moreno*, 2020 WL 5740265 at *7. Mr. Martin, Wellpath's Chief Information Officer, agreed during his deposition that one of the motivating factors behind the decision to adopt the Policy was to destroy bad emails that could be produced in discovery. Wellpath's lawyers, who decided to implement the Policy mid-discovery, were the same lawyers who conducted the remainder of discovery in an avoidant manner that omitted any mention of the Policy and prolonged the case.

In *Stewart*, the court noted the factual similarities with *Moreno* and concluded that an inference of intent could be supported in *Stewart* as well. Wellpath had received a claims notice and a document request from the plaintiff when Wellpath decided to implement the Policy and destroy emails sought by plaintiff. The emails in *Stewart* were lost as a result of the same Policy that destroyed evidence in *Moreno*, so the court applied Mr. Martin's deposition with equal force. The discovery process was also similarly impeded by Wellpath's concealment. The court found that such "deceptive conduct that strongly suggests that the Wellpath Defendants hoped

their destruction would not be discovered, which is in turn probative of the Wellpath Defendants' intent." *Estate of Stewart*, 2023 WL 4002680 at *8. The court stepped further to say that Wellpath's actions were even more egregious in this case because it had continued on to conduct a second purge, deleting the inbox of a named defendant, after the answer and affirmative defenses were filed.

In this case, the timing of the Policy is distinguishable, but it still supports an inference of intent. Unlike *Moreno* and *Stewart*, the Notice here was served after the initial round had been completed. Wellpath was aware of Ms. Butterfield's death and the ongoing investigation when it implemented the Policy, but it had not received Plaintiff's Notice until after the initial round. Wellpath nonetheless chose not to place any legal holds and allowed the destruction of discoverable evidence in this case, which gives rise to an inference of intent. The delineating factor is not whether Wellpath, having received notice of a lawsuit, chose to implement a policy that destroys emails; its whether Wellpath, having received notice of a lawsuit, chose to destroy discoverable emails. As to that offense, Wellpath is equally culpable here as it was in *Moreno* and *Stewart*. Here, Wellpath had seventeen days between the time the Notice was received, and the time the first relevant emails were destroyed. Even longer for emails relating to Ms. Butterfield's suicide. Yet, Wellpath chose not to place a legal hold on any emails related to the ongoing investigation until four months after the lawsuit was filed when nearly every discoverable email had been destroyed. This choice directly resulted in the destruction of relevant emails during the rolling-expiration of the first round and the resurrected efforts of the second round. Thus, although the Notice came after the first purge, Wellpath had been notified of this lawsuit when it destroyed the emails relevant to this case.

As to Mr. Martin's deposition and the discovery process, the Court finds that both give rise to an inference of intent. After sitting on plans to implement a program for four years, Wellpath announces a new Policy in 2019 that deletes emails after 1 year, in part to avoid the discovery of "bad emails." This announcement came after three inmates under Wellpath's care died: Mr. Moreno in 2016, Mr. Stewart in 2017, and Ms. Butterfield in 2018. In all three cases, the emails sought by the plaintiffs were successfully lost as a result of the Policy. Because the emails in this case were also destroyed by the same Policy, the Court applies Mr. Martin's deposition with equal force. Plaintiff's discovery process also supports the inference. Wellpath pursued discovery with the same avoidant behavior, requiring years of repeated emails, inquires, conferences, and motions to compel. Like *Stewart*, the Court finds Wellpath's deceptive behavior throughout discovery probative of their intent.

With the forgoing in mind, the Court finds that is it reasonable to infer intent based on Wellpath's actions.

### b. Leon Factors

Given the severity of a default judgment, the Ninth Circuit has laid out five factors for courts to consider prior to issuing terminating sanctions. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).[3] These factors are not to be applied mechanically, but rather as a guiding framework. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). The factors are: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking

---

[3] The *Leon* factors remain a consideration when assessing the applicability of sanctions under Rule 37. *See Estate of Stewart*, 2023 WL 4002680 at *8-9; *Estate of Moreno*, 2020 WL 5740265 at *7-10; *Facebook, Inc. v. OnlineNIC Inc.*, Case No. 19-cv-07071-SI (SVK), 2022 WL 2289067 at *8-12 (N.D. Cal. Mar. 28, 2022); *see also* Devlin Decl., ECF No. 168-1 (Judge Immergut's Order Denying Motion for Reconsideration in Estate of Stewart v. Wellpath, Case No. 6:19-cv-01883).

sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Id.*

The first and second factors are addressed together. This case, like the other two, has been significantly delayed by Wellpath's omissions. Discovery has taken almost three years, two motions to compel, and countless emails and conferences during which Wellpath gave Plaintiff and this Court misleading answers about why they did or did not comply with discovery requests. Wellpath's decision to cause such delays grows increasingly indefensible with every case litigated in relation to the Policy's discovery consequences. Wellpath has already received two default judgments from other courts for precisely this behavior, one of which was handed down before Wellpath even began its discovery in this case. Speaking specifically of the instant Motion, Wellpath's choice to fight this same battle for the third time, delaying the underlying litigation further, and stalling any broader reaching justice that could be issued by its decision, is evident of Wellpath's steadfast defiance to an expeditious resolution. The first two factors weigh in favor of terminating sanctions.

The remaining factors are interconnected. Risk of prejudice, public policy's preference towards resolution on the merits, and the availability of less drastic sanctions "all require the Court to consider whether a legitimate trial on the merits is possible, considering Defendants' widespread spoliation." *Estate of Moreno*, 2020 WL 5740265 at *8. "In deciding whether to impose case-dispositive sanctions, the most critical factor is not merely delay or docket management concerns, but truth." *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1097. It is critically a question of "whether the discovery violations 'threaten to interfere with the rightful decision of the case." *Id.* (internal quotations omitted). Relatedly, the court may refuse to impose a less severe sanction if the court "anticipates continued deceptive misconduct." *Id.*

The third factor considers risk of prejudice to the party seeking sanctions. Here, Wellpath has destroyed most, if not all, of the emails from the named Defendants who were directly involved in the care and post-mortem review of Ms. Butterfield. She was booked into Josephine County Jail in the midst of a severe mental break and placed in a cell for forty days before she took her life. Prior to that point, Ms. Hinkle was employed as a nurse practitioner, Ms. Case, Ms. Hulsey, and Ms. Wass were employed as EMT/CMAs, Dr. Shah was Wellpath's Medical Director at the Josephine Country Jail, and Ms. Shevokis was the Health Services Administrator. All their emails, regarding Ms. Butterfield's care, mental state, interactions, general impressions, and any other details relevant to Plaintiff's claims were destroyed permanently by August 2020. The court echoes *Moreno* in saying, it can think of few sources more helpful in evaluating these claims than the internal communications between Wellpath and the employees in the jail. The contents of these emails are not recoverable and likely not replaceable through other avenues of discovery. The third factor weighs in favor of default judgment.

The fourth factor, which considers that public policy favors resolving cases on their merits, typically weighs against the imposition of terminating sanctions. The courts in *Moreno* and *Stewart*, however, found that Wellpath's "destruction of countless email communications between its employees" threatened to interfere with the rightful decision of the case, such that the fourth factor could not weigh against terminating sanctions. Because Wellpath's actions caused a similar threat in this case, the Court finds the fourth factor does not weigh against terminating sanctions.

The fifth factor looks to less drastic sanctions. Wellpath proposes alternative methods such as an admission of evidence regarding the spoliation of ESI coupled with the sanction of an adverse inference jury instruction. The Court is not confident that a lesser sanction would

remedy the harm done by destroying every email of the six named Defendants who were directly involved in Ms. Butterfield's care. Moreover, given that Wellpath has repeatedly failed to correct course on this exact issue, the Court does not find that lesser sanctions would be effective.

The Court therefore recommends granting Plaintiff's Motion for terminating sanctions.

**II.     Wellpath Defendants' Evidentiary Objections (#151) should be dismissed.**

Wellpath Defendants raise evidentiary objections in opposition to Plaintiff's Motion for Sanctions and the supporting Declaration of John Devlin. Wellpath lists seven general objections and 21 specific objections. For the following reasons, the Court finds the objections largely inapplicable and recommends they be denied.

As to the general objections, the Court relies on evidence in the record, not mere pleadings. Objections concerning unfair prejudice, foundation, hearsay, and conclusory allegations generally are ripe for review if the evidence is later presented to a jury for trial. However, at this phase, the Court is permitted and able to consider the evidence and apply it fairly. For the specific objections, the Court's analysis is largely unimpacted by the concerns raised by Wellpath. The statements raised in Objection Nos. 1, 2, 4, 5, 7–10, 14, and 16–21 are not relied upon in this Findings and Recommendation. Objection Nos. 3, 6, and 11 are supported by evidence on the record and are not otherwise prejudicial, irrelevant, or hearsay. As for Objection Nos. 12, 13, and 15 concerning the *Moreno* and *Stewart* cases, the Court is permitted to consider precedent and does not rely on the Plaintiff's conclusions to do so.

Whether its viable to present specific evidence to a jury is a question that should be revisited at a later opportunity. This Findings and Recommendation does not foreclose those discussions.

## RECOMMENDATION

Wellpath Defendants' evidentiary objections should be DENIED. Plaintiff's Motion for Sanctions in the form of a default judgment against the Wellpath Defendants, Wellpath, LLC and Correct Care Solutions, LLC, should be GRANTED. The Court is satisfied that the Wellpath Defendants intentionally destroyed email evidence in order to prevent its use at trial, and further delayed the litigation by purposefully omitting any mention of the Policy. The Court recommends judgment be entered for Plaintiff as to liability on all claims brought against the Wellpath Defendants. This matter should proceed to trial for a determination of damages against the Wellpath Defendants. The Court notes that there are twelve (12) remaining Defendants who's conduct was not at issue in this motion and who's liability has not been determined.

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days after the date this recommendation is entered. If objections are filed, any response to the objections is due fourteen (14) days after the date the objections are filed. *See* Fed. R. Civ. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this 29 day of January, 2024.

MARK D. CLARKE
United States Magistrate Judge