UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| CONNIE DENICE, as personal representative for the Estate of JANELLE MARIE BUTTERFIELD, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>WELLPATH, LLC, a Delaware corporation; CORRECT CARE SOLUTIONS, LLC, a Kansas corporation; DAWN CASE; CARLY HINKLE; CRYSTAL HULSEY; VIVEK SHAH; PARTICIA SHEVOKIS; AMANDA WASS; JOSEPHINE COUNTY, an Oregon county; DAVE DANIEL; and ED VINCENT,<br><br>Defendants. | Case No. 1:20-cv-00671-CL<br><br>**FINDINGS AND RECOMMENDATION** |

**CLARKE,** United States Magistrate Judge.

Plaintiff Connie Dence ("Plaintiff"), as personal representative for the Estate of Janelle Butterfield, brings this civil rights action arising out of Ms. Butterfield's suicide while in custody at Josephine County Jail (the "Jail"). Plaintiff brings claims against Defendants Josephine County, Sheriff Dave Daniel, and Jail Commander Ed Vincent ("Defendants") for the deprivation of Ms. Butterfield's Fourteenth Amendment right to be free from deliberate indifference to inadequate medical care and against Josephine County for negligence. Plaintiff's claims against Defendants Wellpath, LLC aka/fka Correct Care Solutions, LLC, and its

employees ("Wellpath") are stayed pending a bankruptcy proceeding. ECF No. 220. Before the Court is Defendants' Motion for Summary Judgment (ECF No. 230). On February 24, 2026, the Court heard oral argument. ECF No. 248. For the reasons below, Defendants' Motion should be GRANTED in part and DENIED in part.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*). The court cannot weigh the evidence or determine the truth; it may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a party makes a properly supported motion for summary judgment, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the nonmoving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## BACKGROUND

The following facts are recounted in the light most favorable to the nonmoving party, Plaintiff.

At all relevant times, County policy provided that Wellpath was responsible for the "physical health care" of Adults in Custody ("AICs") and that Options of Southern Oregon ("Options") was responsible for AICs' "mental health care." ECF No. 241-63 at 2.

### I. Wellpath

Registered nurse Patricia Shevokis ("RN Shevokis") served as the Jail's Health Services Administrator ("HSA"). ECF No. 241- 68 at 22:22-23:13. As the HSA, RN Shevokis supervised Wellpath's EMTs, and she met with the Jail commander, Lieutenant Vincent, on a weekly basis to discuss "jail issues or any grievances."[1] ECF No. 241-18 at 225:3-226:3; Devlin Decl. Ex. 12 ("Vincent Dep.") at 32:16-24, ECF No. 241-12.

Wellpath's EMTs were "unlicensed assistive personnel." ECF No. 241-31 at 55:6-16. Their responsibilities included performing intake screenings of AICs and conducting "segregation rounds." Devlin Decl. Ex. 19 ("Bartl Dep.") at 97:17-98:14, ECF No. 241-19; Devlin Decl. Ex. 30 ("Petchell Dep.") at 209:12-21, ECF No. 241-30. During "segregation rounds," EMTs would look into the cells, make "very quick observation of anyone that was in the segregation units," and "make sure that the inmate was in their cell and alive." ECF No. 241-31 at 68:21-69:9, 72:1-14. EMTs were trained "on the job" to perform those rounds. *Id.* at 69:3-9.

[1] The record indicates that Jail personnel used the terms "certified medical assistants" ("CMAs"), "med techs," and "EMTs" interchangeably to describe the same Wellpath employees. Vincent Dep. at 34:15-24.

A nurse practitioner also worked at the Jail four hours per week. ECF No. 241-18 at 29:23-30:5.

## II. Options

The County's contract with Options expired in June 2015 and no agreement existed between the County and Options during the relevant periods when Ms. Butterfield was in custody. ECF No. 241-74 at 1; ECF No. 241-27 at 3.

Options staff met with AICs when referred by Jail deputies or Wellpath employees. Devlin Decl. Ex. 8 ("Kelly-Robinson Dep.") at 78:15-79:8, ECF No. 241-8. Merrick Kelly-Robinson ("Kelly-Robinson"), a Licensed Professional Counselor ("LPC") intern, was the Jail's full-time qualified mental health professional. *Id.* at 36:8-14, 47:20-22. Kelly-Robinson recommended medications for AICs to Wellpath staff and conducted aid and assist consultations. *Id.* at 68:1-8, 143:2-17. Kelly-Robinson's supervisor did not work in the Jail or have contact with AICs. *Id.* at 39:12-40:3.

Although Wellpath and Options were the only medical and mental health care providers in the Jail, neither entity shared records with the other. Kelly-Robinson Dep. at 126:19-21; Petchell Dep. at 130:11-131:7. According to Wellpath Regional Operations Manager Rachel Petchell ("Petchell"), "the Jail at that time, that is what they wanted. They wanted Options there working by themselves."[2] Petchell Dep. at 133:3-8.

---

[2] According to Plaintiff, Rachel Petchell was known as "Rachel Hemphill" in 2018. Pl.'s Resp. at 35. For clarity, the Court will refer to her as Rachel Petchell.

## III. Josephine County Sheriff's Office

Sheriff Daniel was elected in 2014 and appointed Lieutenant Vincent as Jail commander shortly thereafter. Devlin Decl. Ex. 64 ("Daniel Dep.") at 10:25-11:3, ECF No. 241-64. Sheriff Daniel did not review Lieutenant Vincent's personnel file before doing so. *Id.* at 86:3-87:25.

As Jail commander, Lieutenant Vincent reported only to Sheriff Daniel and the County undersheriff. *Id.* at 15:4-13. Lieutenant Vincent was responsible for setting, reviewing, and approving Jail policies, and Sheriff Daniel and the undersheriff reviewed and approved those policies. *Id.* at 18:4-14; Vincent Dep. at 16:13-20. Even though Sheriff Daniel believed that Lieutenant Vincent was responsible for ensuring that Wellpath complied with its contract with the County with respect to "hours of service and things like that," Sheriff Daniel did not know if any County officials actually oversaw Wellpath or Options' work in the Jail. Daniel Dep. at 106:17-107:4, 107:22-108:11.

Lieutenant Vincent took a "hands-on" management style as Jail commander. Vincent Dep. at 18:24-19:4. His office was near the Jail's booking area, and he met regularly with Wellpath and Options staff. *Id.* at 14:7-11, 32:16-24, 37:12-16. Although he was familiar with Wellpath's Staffing Matrix, which provided for a full-time registered nurse ("RN") and several EMTs, Lieutenant Vincent did not know how Wellpath and Options coordinated care for AICs. *Id.* at 40:16-41:22, 46:8-18; ECF No. 241-65 at 14. He also understood that Options was "in charge" of the Jail's mental health program but did not recall reviewing any contracts or agreements related to Options' services. Vincent Dep. at 44:7-23.

## IV. Jail Policies

Under Jail policy, "Health care personnel working in the Jail [were] required to meet the same certification and licensing requirements as do health care professionals who provide

services to people not incarcerated." ECF No. 241-73. In addition, Jail policy prohibited interns and "other non-certified personnel" from providing "health services" to AICs unless the person worked "under the direct supervision of a certified health care professional." ECF No. 241-83. Jail policy further acknowledged that "[t]he absence of licensed, certified staff may also place the county at risk if the unlicensed health care providers harm the inmates for whom they are providing care." ECF No. 241-73.

Jail policy also required "the Jail to provide adequate health care screening, examination, diagnosis, and treatment to inmates." ECF No. 241-63 at 1. For example, AICs were required to receive a mental health screening and a suicide risk assessment during booking. ECF Nos. 241-10, 241-11. Jail deputies received 3.5 hours of suicide prevention training upon hire and a "refresher training" of up to two hours. ECF No. 241-100 at 11. If, after performing the suicide risk screening, a deputy determined that an AIC was at risk for suicide, the deputy was required to notify the shift supervisor, and the shift supervisor was required to notify "the Josephine County Mental Health provider"—Options—that the person was at risk of suicide. ECF No. 241-10 at 1; ECF No. 241-63 at 2. The Suicide Risk policy further provided that, "[w]hile waiting for a mental health specialist to evaluate, deputies will isolate the inmate and restrict the inmate's access to sheets, blankets and any item by which the inmate could harm himself." ECF No. 241-10 at 2.

Within 24 hours of entering custody, an AIC was required to receive an "intake screening" from an EMT, CMA, or nurse. Bartl Dep. at 97:17-98:14. Within 14 days of entering custody, the AIC was required to receive a health assessment from a Wellpath RN. ECF No. 241-33 at 1; Bartl Dep. at 81:6-22. The 14-day assessments included a "body system evaluation," "a mental health evaluation," and "a review of [the AIC's] health care record."

Bartl Dep. at 80:8-81:22; ECF No. 241-33. EMTs, CMAs, and licensed practical nurses were not permitted to perform those assessments. Bartl Dep. at 81:11-22.

In addition, the Jail's housing policy required employees to review an AIC's housing assignment within one week of the AIC's initial assignment and then monthly thereafter. ECF No. 241-37.

## V. Ms. Butterfield's Incarceration at the Jail

### A. Prior to July 2018

Ms. Butterfield was incarcerated in the Jail several times prior to her September 2018 death. In February 2016, Ms. Butterfield's conduct caused deputies to place her on suicide watch. ECF No. 241-47 at 1; ECF No. 241-46. During an August 2017 intake, when asked if she had tried to harm herself or attempted suicide within the last six months, Ms. Butterfield responded that she had "tried cutting herself but did not break the skin." ECF No. 241-53. In April 2018, an Options psychiatrist evaluated Ms. Butterfield and indicated that she suffered from "substance induced psychosis" and that "[h]er history of violence, the presence of psychosis and mood lability are risk factors for impulsive actions." ECF No. 241-54 at 1, 5-6.

In May 2018, a family member of Ms. Butterfield sent an email to the County stating that Ms. Butterfield had "paranoid schizophrenia." ECF No. 241-59 at 2. The family member thanked the County for "for realizing that [Ms. Butterfield] has people who love her dearly" and "for accepting our cards." *Id.* A County employee forwarded that email to Lieutenant Vincent, who then "looked at the records regarding Ms. Butterfield's lodge at the Jail." *Id.* at 1; ECF No. 241-60 at 2.

### B. July 2018 – September 2018

On July 27, 2018, Ms. Butterfield was arrested and taken to the Jail. ECF Nos. 241-1, 241-2. At the Jail, Ms. Butterfield resisted deputies and spoke constantly while four law

enforcement officers put her into a restraint chair. ECF No. 241-5; ECF No. 241-3, Video 3. While officers restrained her, Ms. Butterfield said, "I'm suicidal." ECF No. 241-3, Video 3 at 3:00.

Although a deputy began filling out a County Inmate Medical/Suicide Questionnaire for Ms. Butterfield, the deputy only completed the first few questions. ECF No. 241-16 at 20. The deputy did not mark any responses to the mental health section, including the question "Are you wanting to hurt yourself or commit Suicide." *Id.* Deputies then placed Ms. Butterfield on a 15-minute watch and made a "mental health request" in the Jail's computer system. ECF No. 241-5. Deputies observed that Ms. Butterfield was talking to herself, that she refused to allow the deputies to remove her restraints, and that she was "playing in the drain." ECF No. 241-6 at 2-5.

Ms. Butterfield did not receive an intake screening from a Wellpath employee. Bartl Dep. at 146:21-147:2. However, later that day, the nurse practitioner prescribed Ms. Butterfield Abilify, a medication used to treat psychosis, without having assessed her. ECF No. 241-16 at 2, 19; Bartl Dep. at 123:2-6; ECF No. 241-70 at 5-6.

On July 28, 2018, Ms. Butterfield refused to return to a housing unit and "took a swing" at a deputy. ECF No. 241-22 at 1. A deputy fired a taser at her, causing her to fall to the ground. *Id.* Deputies sanctioned Ms. Butterfield with disciplinary segregation. ECF No. 241-24. AICs in disciplinary segregation were allowed out of their cells for 15 minutes at a time, twice a week. ECF No. 241-14 at 35:21-36:1. Ms. Butterfield remained in disciplinary segregation until August 6, 2018. *Id.* at 35:11-20. In general, AICs' housing classifications did not trigger mental health services from Options. Kelly-Robinson Dep. at 227:2-12.

According to an EMT, Wellpath was "critically understaffed" in July 2018. ECF No. 241-84. From July 2018 through September 2018, RN Shevokis was prohibited from having

patient contact due to an injury. ECF No. 241- 68 at 131:12-25. Although she still reported to the Jail on a daily basis and reviewed the EMTs' progress notes, RN Shevokis testified that she did not know if another RN was seeing patients in her place. *Id.* at 132:1-17, 141:1-19. During that period, Wellpath terminated the employment of an EMT who had reported that RN Shevokis had forged records and had used racist and homophobic slurs toward AICs and Jail staff. ECF No. 241-32 at 129:6-8, 170:13-171:8.

On August 6, 2018, Ms. Butterfield's housing classification was changed to "nondisciplinary segregation." ECF No. 241-14 at 36:2-5, 37:17-25. AICs in that classification were allowed out of their cells for up to one hour per day. *Id.* at 38:19-39:10.

Ms. Butterfield did not receive a 14-day assessment from a Wellpath nurse. Bartl Dep. at 149:3-7. She accepted her medication on some days and refused it on others. ECF No. 241-16 at 11, 15, 17, 18. Even though the nurse practitioner had prescribed Ms. Butterfield medication for 90 days, Wellpath did not provide it to her after August 12, 2018. *Id.* at 27; ECF No. 241-18 at 145:3-8; ECF No. 241-17 at 135:6-19.

On August 24, 2018, at Ms. Butterfield's attorney's request, a licensed clinical psychologist interviewed Ms. Butterfield and determined that she was unfit to proceed. ECF No. 241-35 at 1, 8. The psychologist determined that Ms. Butterfield met "the diagnostic criteria for mental disease and disorder," that she "presents as a disorganized schizophrenic," and that she needed treatment at the Oregon State Hospital. *Id.* at 8.

Although Jail staff were required to complete a housing reassessment for Ms. Butterfield by the end of August 2018, they did not do so, and Ms. Butterfield remained in "nondisciplinary segregation" until her death. ECF No. 241-37; ECF No. 241-38 at 2; Defs.' Reply at 6.

Ms. Butterfield's only encounter with an Options employee that summer occurred on August 30, 2018, after her attorney requested an aid and assist consultation. ECF No. 241-42 at 2; Kelly-Robinson Dep. at 182:12-20. Kelly-Robinson met with Ms. Butterfield and noted that she "was having issues tracking questions and having appropriate answers" but that she was "not currently a risk to herself." ECF No. 241-42 at 1-2. Although Kelly-Robinson knew that Ms. Butterfield had been in custody since late July, they did not know that Ms. Butterfield had been in segregation or that she had been prescribed medication to treat psychosis. *Id.* at 2; Kelly-Robinson Dep. at 158:23-159:12.

On September 5, 2018, deputies found Ms. Butterfield hanging from a bed sheet in her cell. ECF No. 241-44 at 4. Oregon State Police's investigation indicated that, in the few days before her death, Ms. Butterfield had been "hiding in corners in her room," that she had not been eating, and that she had "refused time out of her cell." *Id.* at 19. In addition, an AIC in a nearby cell stated that, the night before Ms. Butterfield died, she saw Ms. Butterfield wearing a blanket "draped around her neck." *Id.* at 20. The AIC thought that deputies might have taken the blankets from Ms. Butterfield because deputies had removed blankets from AICs who had worn them around their necks in the past. *Id.*

Lieutenant Vincent's memorandum to Sheriff Daniel regarding Ms. Butterfield's death represented that Ms. Butterfield had "never disclosed being suicidal and was never placed on suicide watch" and that he had "not been made aware of any suicidal comments or concerns (refer to mental health records.)." ECF No. 241-97 at 2. However, Lieutenant Vincent testified that he did not interview anyone before drafting the memorandum, nor did he review Ms. Butterfield's medical records, mental health records, or her previous Jail records. Vincent Dep. at 132:14-133:5.

Wellpath's "Mortality and Morbidity Report and Review" indicated that Ms. Butterfield's reports were not "complete and accurate" because there was "no mental health." ECF No. 241-21 at 6. Under "Interventions to reduce risks, improve patient care, or improve future outcomes," Petchell wrote, "Intake screens need to be done on admission. Patients on psych meds need MH follow up." *Id.* at 7.

Later in September 2018, Petchell notified Wellpath human resources that five employees had recently complained about RN Shevokis. ECF No. 241-91 at 1-2. Although Petchell had wanted to terminate RN Shevokis' employment, she believed that Lieutenant Vincent had obstructed those efforts because he and RN Shevokis had a "very close relationship." Petchell Dep. at 60:1-10, 100:3-12. Wellpath ultimately terminated RN Shevokis' employment in October 2018. ECF No. 241-93.

## VI. Plaintiff's Expert Reports

Plaintiff has submitted the following expert reports.

### A. Bradford Hanson

Bradford Hanson is a former prison warden who has more than 42 years of experience in correctional agencies and jails. ECF No. 241-100 at 2. Hanson opined that the County's suicide prevention training was "inadequate" and did not meet "well recognized recommendations." *Id.* at 10-11.

### B. Richard Hayward, Ph.D.

Richard Hayward is a licensed clinical psychologist who began working in correctional settings in 1979. ECF No. 241-101 at 3. Dr. Hayward opined that "EMTs and LPCs were conducting clinical encounters that were beyond their scope of practice." *Id.* at 11. According to Dr. Hayward, the County's use of EMTs "to provide basic mental health services" and to serve

as "the first responders to inmates having a mental health crisis" was "inappropriate due to their lack of mental health expertise and their lack of a license to practice mental health." *Id.*

**C. Debra Pinals, M.D.**

Debra Pinals is a licensed physician with more than 25 years of clinical experience in psychiatry. ECF No. 241-103 at 1. Dr. Pinals opined that Wellpath personnel "were performing work out of scope of their licensure as EMT and there was inadequate supervision of their work." *Id.* at 23. Dr. Pinals further stated that Ms. Butterfield's psychiatric care was "lacking" and "[t]hat [Ms. Butterfield's] death could have been prevented with improved monitoring and overall mental health services is clear." *Id.* at 20-21, 24.

**D. Joseph Ponte**

Joseph Ponte is a former prison warden with more than 40 years of experience in correctional settings. ECF No. 241-105 at 1. Ponte opined that "[g]ood policy and procedures is only as good as staff compliance with the written document" and that Ms. Butterfield's incomplete Inmate Medical/Suicide Questionnaire demonstrates that Jail staff had a "total disregard for the policy and proper treatment" of Ms. Butterfield's mental health. *Id.* at 5.

**DISCUSSION**

Defendants move for summary judgment on Plaintiff's: (1) Section 1983 *Monell* claim against Josephine County; (2) Section 1983 claim against Sheriff Daniel and Lieutenant Vincent; and (3) state law negligence claim against Josephine County.

Defendants are entitled to summary judgment on the claim against Sheriff Daniel. However, the Court finds that genuine issues of material fact preclude summary judgment on Plaintiff's remaining claims. Therefore, the Court recommends granting in part and denying in part Defendants' motion for summary judgment on Plaintiff's *Monell* claim, denying Defendants' motion for summary judgment on Plaintiff's Section 1983 claim against Lieutenant

Vincent, and denying Defendants' motion for summary judgment on Plaintiff's negligence claim.

## I. Municipal Liability (*Monell* Claim)

To prevail on a civil rights claim under 42 U.S.C. § 1983, a plaintiff must establish that (1) a person acting under color of law (2) deprived the plaintiff of a federal constitutional right. *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011). There is no dispute that Defendants acted under color of law in this case.

Plaintiff asserts a Fourteenth Amendment claim against the County pursuant to *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978), and identifies numerous "policies, customs or practices" that, in Plaintiff's view, violated Ms. Butterfield's right to constitutionally adequate medical care. Pl.'s Resp. at 57-59. Defendants argue that Plaintiff has failed to offer evidence that any of the alleged policies or customs were unconstitutional. Defs.' Mot. Summ J. at 12-13.

In general, to impose *Monell* liability on a municipality, a plaintiff must prove: "(1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021).

An AIC's right to adequate medical care is well-settled. "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) ("Individuals in state custody have a constitutional right to adequate medical treatment."). The "duty to provide medical care encompasses detainees'

psychiatric needs." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002), *overruled by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Further, pretrial detainees have "a clearly established constitutional right to have a proper medical screen conducted to ensure the medically appropriate program [is] initiated." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 971 (9th Cir. 2021) (explaining that, "at a minimum, medical personnel at jail facilities are required to screen pretrial detainees for critical medical needs").

To establish a municipality's policy, a plaintiff must present evidence that: (1) the municipality "acts pursuant to an expressly adopted official policy"; or (2) the municipality had a "longstanding practice or custom" of failing "to implement procedural safeguards to prevent constitutional violations" or to provide adequate training; or (3) "the individual who committed the constitutional tort was an official with final policy-making authority." *Id.* at 973–74 (internal quotation marks omitted). The "unconstitutional policy need not be formal or written" but "it must be so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* at 974 (internal quotation marks omitted).

A plaintiff can demonstrate that a policy amounts to deliberate indifference in two ways. *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1142 (9th Cir. 2020). Ordinarily, a plaintiff must "point to a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Id.* The plaintiff must show that the municipality "had actual or constructive knowledge that its practices were substantially certain to cause a constitutional violation." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021). Alternatively, a plaintiff can show that a municipality was deliberately indifferent when its policy is "so facially deficient that any reasonable policymaker would recognize the need to take action." *Hyun Ju Park*, 952 F.3d at 1141. Under that method, "a

plaintiff need point only to the policy itself to establish that the municipality's policymakers were on notice that the plaintiff's federally protected rights would likely be violated if they failed to act." *Id.* at 1141–42 (internal quotation marks omitted).

**A. Practice or Custom of Providing Inadequate Medical and Mental Health Care**

Plaintiff has raised a question of fact as to whether the County had a longstanding practice or custom of failing to provide regular medical assessments and of allowing unqualified and unsupervised personnel to work in the Jail. As noted above, under Jail policy, "Health care personnel working in the Jail are required to meet the same certification and licensing requirements as do health care professionals who provide services to people not incarcerated." ECF No. 241-73. Moreover, "[t]he use of interns, students and other non-certified personnel in the delivery of health services to inmates" was only permitted "under the direct supervision of a certified health care professional." ECF No. 241-83. Jail policy further acknowledged that "[t]he absence of licensed, certified staff may also place the county at risk if the unlicensed health care providers harm the inmates for whom they are providing care." ECF No. 241-73. Jail policy also required that every AIC—irrespective of their condition—receive a health assessment from a Wellpath RN within 14 days of entering custody.

The summary judgment record supports a finding that no AICs received mandatory 14-day assessments while RN Shevokis was restricted duty from July 2018 to September 2018. Plaintiff has offered evidence that EMTs, who were unlicensed assistive personnel, worked unsupervised in the Jail during that period and that they consistently worked "beyond their scope of practice." ECF No. 241-103 at 23. Plaintiff has also presented evidence that Kelly-Robinson, an LPC intern, worked unsupervised in the Jail during that period and during their entire employment at the Jail. Thus, a reasonable jury could find that the County had a longstanding

practice or custom of failing to provide regular medical assessments and of allowing unqualified and unsupervised personnel to work in the Jail.

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could determine that the County acted with deliberate indifference. A jury could find that, by adopting the foregoing formal policies, the County knew of a substantial risk of serious injury or death to AICs by allowing EMTs and interns to provide medical and mental health care while unsupervised and by failing to provide AICs with regular medical screenings. Nevertheless, the County allowed EMTs and interns to work in the Jail unsupervised and did not provide AICs regular medical screenings. Thus, a jury could conclude that, because the County "had actual or constructive knowledge that its practices were substantially certain to cause a constitutional violation," it acted with deliberate indifference. *See Sandoval*, 985 F.3d at 682.

Plaintiff has also created a question of fact as to whether the County's practices or customs were the moving force behind Ms. Butterfield's death. *Sandoval* is instructive here. In that case, the AIC died of a methamphetamine overdose after jail medical staff had left him "unmonitored for eight hours, despite signs that he was under the influence of drugs, and then failed to promptly summon paramedics when they discovered him unresponsive and having a seizure." *Id.* at 661. The Ninth Circuit concluded that the plaintiff had created a genuine dispute of material fact as to whether the county's practices had caused the AIC's death. *Id.* at 682. Specifically, the Court explained that "[a] jury could find that had [the AIC] been monitored by the nursing staff—instead of being abandoned for nearly eight hours—his deteriorating medical condition would have been discovered earlier." *Id.* In addition, the Court noted the opinion of the plaintiff's expert, who "opined that [the AIC] likely would have survived the overdose if he had been taken to the hospital at any time before he went into cardiac arrest." *Id.*

Similarly, a reasonable jury could find that, had Ms. Butterfield been adequately evaluated by qualified medical personnel and appropriately referred to mental health services, those professionals could have discovered her deteriorating mental health sooner. Notably, the County does not dispute that Ms. Butterfield did not receive a "mandatory health assessment from a Wellpath registered nurse." Defs.' Reply at 5. Further, Dr. Hayward opined that allowing EMTs to serve as "the first responders to inmates having a mental health crisis" and "to provide basic mental health services" was "inappropriate due to their lack of mental health expertise and their lack of a license to practice mental health." ECF No. 241-101 at 11. Moreover, Dr. Pinals asserted "[t]hat [Ms. Butterfield's] death could have been prevented with improved monitoring and overall mental health services is clear." ECF No. 241-103 at 29. Given the evidence in the record regarding Ms. Butterfield's death, a reasonable jury could determine that providing adequate medical screenings and staffing at the Jail could have prevented her death. Therefore, Plaintiff has created a fact question as to whether the Jail's policies and customs were the moving force behind the constitutional violations alleged in this case.

Plaintiff's claim under the foregoing theories of *Monell* liability should proceed.

**B. Policy, Custom, or Practice of Failing to Train**

Plaintiff's theory of *Monell* liability that the County had a policy, custom, or practice of failing to provide constitutionally adequate "suicide prevention training" should not proceed. Pl.'s Resp. at 57, 59.

When a plaintiff alleges a *Monell* claim under a failure to train theory, the plaintiff must present evidence of (1) "a constitutional violation;" (2) "a municipal training policy that amounts to a deliberate indifference to constitutional rights;" and (3) "that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. Cnty. of*

*San Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) (internal quotation marks omitted). Alternatively, a plaintiff can establish a municipality's deliberate indifference by showing that "the unconstitutional consequences of failing to train" are "so patently obvious" that the municipality could be liable "without proof of a pre-existing pattern of violations." *Id.* at 64. Moreover, proving that "an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice" under a failure to train theory. *Id.* at 68 (internal quotation marks omitted). Thus, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

Plaintiff has not presented evidence of a pattern of untrained County employees committing similar constitutional violations to support a finding that the County acted with deliberate indifference. Here, Jail policy required deputies to complete a mental health screening and a suicide risk screening for AICs at intake, and deputies did not do so for Ms. Butterfield. Although Plaintiff's expert opines that Ms. Butterfield's incomplete screening demonstrates that Jail staff had a "total disregard for the policy and proper treatment of [Ms. Butterfield's] mental health," ECF No. 241-105 at 5, that opinion does not create a fact question as to a pattern of similar constitutional violations by untrained Jail deputies.

Further, Plaintiff has not created a question of fact as to whether the inadequacy of any training was so obviously likely to lead to constitutional violations as to constitute deliberate indifference. The summary judgment record indicates that Jail deputies received 3.5 hours of

suicide prevention training upon hire and a "refresher training" of up to two hours. ECF No. 241-100 at 11. Although Plaintiff's expert asserts that the foregoing training was inadequate, evidence that an incident "could have been avoided if an [employee] had had better or more training" does not establish that a municipality acted with deliberate indifference. *See Connick*, 563 U.S. at 68. Therefore, Plaintiff has not shown that any failure to train County employees on suicide prevention was "so patently obvious" to the County as to constitute deliberate indifference. *See id.* at 64*; see also Nordenstrom for Est. of Perry v. Corizon Health, Inc.*, No. 3:18-CV-01754-HZ, 2021 WL 2546275, at *14 (D. Or. June 18, 2021) (explaining that, even if "a reasonable jury might conclude that the quality of training or amount of training constituted negligence," the evidence did not support single-incident liability).

Summary judgment as to *Monell* subclaim (e) in Paragraph 128 of Plaintiff's Amended Complaint should be granted.

## II. Individual claims under Section 1983

Plaintiff alleges that Sheriff Daniel and Lieutenant Vincent were deliberately indifferent to Ms. Butterfield's Fourteenth Amendment right to adequate medical care. Am. Compl. ¶123.

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). Those claims are "evaluated under an objective deliberate indifference standard." *Id.*

When, as here, a plaintiff asserts claims against a defendant in a supervisory position, the supervisory official may be liable under Section 1983 "if there exists either (1) his or her

personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish a casual connection with evidence that the defendant "set[ ] in motion a series of acts by others" or committed conduct "that showed a reckless or callous indifference to the rights of others." *Id.* A causal link is also established when a defendant "had knowledge of the constitutional deprivations and acquiesced in them." *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018); *see also Starr*, 652 F.3d at 1207 ("The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right."). However, a supervisor "cannot be liable merely by virtue of his position." *Burnard v. Giblin*, No. 6:22-CV-01982-MC, 2025 WL 2938776, at *4 (D. Or. Oct. 16, 2025) (granting summary judgment on a Section 1983 claim against an agency director in his individual capacity because the evidence did not establish the director's "direct personal involvement") (citing *Keates*, 883 F.3d at 1243)).

A court properly grants summary judgment to a supervisor when the record "does not establish that [the defendant] supervised the day-to-day operations of [the jail], that he was personally involved in any constitutional deprivation [the AIC] may have suffered, or the requisite causal connection for liability in his individual capacity." *King v. Cnty. of Los Angeles*, 885 F.3d 548, 559 (9th Cir. 2018). In contrast, summary judgment is inappropriate when a plaintiff plausibly alleges that a sheriff "acquiesced in the unconstitutional conduct of his subordinates" and that he "took no action to stop his subordinates' repeated violations of prisoners' constitutional rights despite being repeatedly confronted with those violations." *Starr*, 652 F.3d at 1216.

### A. Sheriff Daniel is entitled to summary judgment.

Summary judgment should be granted on Plaintiff's claim against Sheriff Daniel because Plaintiff has failed to establish a causal link between his conduct and a constitutional violation. Plaintiff does not argue that Sheriff Daniel was personally involved in the events at the Jail; rather, Plaintiff contends that his "lack of knowledge of the basic deficiencies of the medical and mental health programs is the result of his deliberate choice to be indifferent to his duty to oversee those programs." Pl.'s Resp. at 52. In Plaintiff's view, Sheriff Daniel is personally liable because "no reasonable sheriff would shirk his responsibility in that manner." *Id.*

The summary judgment record supports Plaintiff's assertion that Sheriff Daniel did not know "basic facts about the medical and mental health programs at the jail." *Id.* at 53. For example, although Sheriff Daniel testified that Lieutenant Vincent was responsible for overseeing the County's contract with Wellpath, he could not name a single County employee who actually oversaw Wellpath or Options' work at the Jail. Daniel Dep. at 106:24-108:11. Moreover, Sheriff Daniel did not review Lieutenant Vincent's personnel file before appointing him Jail commander and did not know the salient facts of Lieutenant Vincent's disciplinary history until the date of his deposition. *Id.* at 88:14-89:16

Nonetheless, under Ninth Circuit precedent, the foregoing evidence is legally insufficient to create a fact question as to whether Sheriff Daniel was personally involved in any alleged constitutional violations or that he was aware of any alleged constitutional violations and acquiesced in them. *See King*, 885 F.3d at 559.

The Court recommends granting Defendants' motion for summary judgment on Plaintiff's Section 1983 claim against Sheriff Daniel, Count One.

### B. Lieutenant Vincent is not entitled to summary judgment.

Defendants argue that Lieutenant Vincent cannot be held liable under Section 1983 because he did not know about any problems with Wellpath and Options and "[t]here is simply nothing in the record that would place [him] on notice that either medical or mental health care were deficient." Defs.' Mot. Summ. J. at 10. The Court disagrees.

The evidence, when viewed in the light most favorable to Plaintiff, creates a fact question as to whether Lieutenant Vincent had knowledge of inadequate medical and mental health staffing at the Jail and whether he acquiesced in it. Specifically, a reasonable jury could find that Lieutenant Vincent knew that Wellpath was "critically understaffed" while Ms. Butterfield was in custody. ECF No. 241-84 at 1. Here, there is no dispute that Lieutenant Vincent was the Jail commander and that he reported only to Sheriff Daniel and the undersheriff. Lieutenant Vincent understood the basic requirements of Wellpath's Staffing Matrix, which provided for a full-time RN and several EMTs, and he met with RN Shevokis on a weekly basis. In addition, the summary judgment record contains evidence that Lieutenant Vincent and RN Shevokis were "very close," that RN Shevokis continued reporting to work while she was on restricted duty, and that she did not see patients during that period. Petchell Dep. at 60:2-10. While RN Shevokis was on restricted duty, Wellpath terminated the employment of an EMT who had lodged several complaints against her.

The foregoing facts, when viewed in the light most favorable to Plaintiff, also allow a reasonable jury to find that Lieutenant Vincent acquiesced in improper staffing at the Jail. Unlike in *King*, 885 F.3d at 559, where summary judgment was appropriate because the defendant did not supervise the jail's day-to-day operations and was not "personally involved" in any alleged constitutional violations, the summary judgment record here contains evidence of Lieutenant Vincent's "hands-on" management style and his weekly meetings with RN Shevokis.

Vincent Dep. at 18:24-19:4. That evidence allows a reasonable jury to find that Lieutenant Vincent knew about the improper medical staffing at the Jail and acquiesced in it. Plaintiff has created a fact question with respect to causation. *See Keates*, 883 F.3d at 1243.

**C. Lieutenant Vincent is not entitled to qualified immunity.**

Defendants assert that Lieutenant Vincent is entitled to qualified immunity because "no similar case law exists that would place" him "on notice that [he] would violate Ms. Butterfield's constitutional rights based on the facts and circumstances known to [him] at the time." Defs.' Mot. Summ. J. at 11-12. The Court disagrees.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). The purpose of qualified immunity is to "strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson*, 555 U.S. at 231).

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Here, the Court has already found that Plaintiff has raised a question of fact as to whether Lieutenant Vincent was deliberately indifferent to Ms. Butterfield's right to constitutionally adequate medical care. The first prong of the analysis is therefore satisfied, and the remaining

question is whether the right violated "was clearly established in light of the specific context of the case." *Id.*

The Supreme Court has emphasized that the asserted right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (brackets and internal quotation marks omitted).

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority[.]'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

*D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (citations omitted). State "'[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances'—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts." *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) (explaining that "The Supreme Court need not catalogue every way in which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated [the plaintiff's] right.").

Lieutenant Vincent was on notice that contracting out medical services did not relieve the Jail of its duty to provide adequate medical care. It is well settled that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody[.]" *West*, 487 U.S. at 56. As relevant here, the Ninth Circuit has explained that allowing unqualified personnel to regularly engage in medical practice can reflect deliberate indifference to AICs' medical needs. *Toussaint v. McCarthy*, 801 F.2d 1080, 1112

(9th Cir. 1986). Moreover, "pretrial detainees have a 'clearly established right' to mental health treatment, including suicide prevention" and the "right to adequate suicide prevention measures was clearly established" by 2013. *Williams v. Cnty.*, No. 2:15-CV-01760-SU, 2016 WL 4745179, at *5 (D. Or. Sept. 12, 2016) (citing *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010), *overruled by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)). Thus, Lieutenant Vincent is not entitled to qualified community.

The Court recommends denying Defendants' motion for summary judgment on Plaintiff's Section 1983 claim against Lieutenant Vincent.

## III. Negligence Claim

Finally, plaintiff alleges a state law negligence claim against the County. Am. Compl. ¶¶ 133-36.

"Traditionally, the basic elements of common-law negligence required a plaintiff to plead and prove that the defendant owed [the] plaintiff a duty, that [the] defendant breached that duty, and that the breach was the cause-in-fact of some legally cognizable damage to [the] plaintiff." *Towe v. Sacagawea, Inc.*, 357 Or. 74, 86, 347 P.3d 766, 774–75 (2015) (internal quotation marks omitted). "[T]he nature and scope of the duty owed by the defendant to the plaintiff can be created, defined, or limited based on, among other things, the relationship between or status of the parties." *Id.* "One of these relationships is that of inmates and their jailors." *Hanington v. Multnomah Cnty.*, 593 F. Supp. 3d 1022, 1044 (D. Or. 2022); *see also* Or. Rev. Stat. § 169.140 ("The keeper of each local correctional facility shall... supply [AICs] with wholesome food, fuel and necessary medical aid.").

Plaintiff alleges that the County violated its duty to Ms. Butterfield in several respects, including by failing to ensure that the County employees were properly trained "in responding to the serious medical needs of inmates." Am. Compl. ¶ 134, 128.

Defendants do not dispute that a special relationship existed between the County and Ms. Butterfield. Rather, Defendants contend that "Plaintiff has not identified a single instance where jail deputies observed and ignored anything from Ms. Butterfield that should have indicated to them that it was foreseeable she would commit suicide" and that Plaintiff cannot establish causation. Defs.' Reply at 22; Defs.' Mot. Summ. J. at 14. The Court disagrees.

Plaintiff has raised a fact question as to whether the County breached its duty of care to Ms. Butterfield. The deputies' conduct is one example. While four law enforcement officers held Ms. Butterfield down in a restraint chair, she said, "I'm suicidal." ECF No. 241-3 (Intake Video 3) at 3:00. Despite that statement, deputies failed to complete a Suicide Risk Assessment for her. Moreover, even though deputies made a "mental health request" in the Jail's computer system, Ms. Butterfield did not meet with Kelly-Robinson until about a month later, at her attorney's request.

Plaintiff has also created a question of fact as to causation. As discussed above, deputies did not complete a Suicide Risk Assessment for Ms. Butterfield. Under the County's Suicide Risk Screening Policy, if a deputy determined from the suicide assessment that an AIC was at risk for suicide, the deputy was required to notify the shift supervisor, who was required to notify "the Josephine County Mental Health provider." ECF No. 241-10 at 2. The policy further provides that, "[w]hile waiting for a mental health specialist to evaluate, deputies will isolate the inmate and restrict the inmate's access to sheets, blankets and any item by which the inmate could harm himself." *Id.* Here, the summary judgment record contains evidence that the night

before Ms. Butterfield died, an AIC saw her wearing a blanket around her neck. The AIC stated that, in the past, deputies had removed blankets from AICs who had done the same. Because a reasonable jury could conclude that deputies performed a negligent suicide assessment and negligent segregation checks as a part of their duties, the County may be held liable. *See* Or. Rev. Stat. § 30.265(1) ("[E]very public body is subject to civil action for its torts and those of its officers, employees and agents acting within the scope of their employment or duties.").

Summary judgment on Plaintiff's negligence claim should be denied.

**RECOMMENDATION**

For the reasons above, Defendants' motion for summary judgment (ECF No. 230) should be GRANTED in part and DENIED in part.

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. *See* Fed. R. Civ. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the district court's judgment or appealable order.

DATED this 15 day of July, 2026.

MARK D. CLARKE
United States Magistrate Judge